(Nos. 73986, 74045 cons.—

GEJA'S CAFE *et al.*, Appellants, v. THE METROPOLITAN PIER AND EXPOSITION AUTHORITY, Appellee.

*Opinion filed November 19, 1992.*

Richard A. Devine, Scott Greene, Brian J. Williams and John J. O'Shea, of Pope & John, Ltd., and Lee J. Schwartz, all of Chicago, for appellants.

Roger J. Kiley, Jr., Hugh R. McCombs, Michele Odorizzi, Phillip S. Reed, Marlaine C. McVisk and Ellen Chapelle, of Mayer, Brown & Platt, and Peggy A. Davis, all of Chicago, for appellee.

JUSTICE HEIPLE delivered the opinion of the court:

This appeal arises out of plaintiffs' eight count complaint challenging the constitutionality of Public Act 87–733, eff. July 1, 1992 (the Act), as well as a tax ordinance (the tax) passed by the defendant (the Authority) pursuant to the Act. The Act amends the Metropolitan Pier and Exposition Authority Act (Ill. Rev. Stat. 1991, ch. 85, par. 1221 *et seq.*). Plaintiffs are two classes that will be adversely affected by the Act: all restaurants and restaurant owners in the taxing district who are subject to the tax, and all persons who may patronize restaurants subject to the tax.

The trial court entered summary judgment on one count and judgment on the pleadings on the remaining seven counts in favor of the Authority. The trial court found no just reason for delay for four counts entered on the pleadings, and plaintiffs appealed to the appellate court pursuant to Illinois Supreme Court Rule 304(a) (134 Ill. 2d R. 304(a)). Plaintiffs later appealed from the final judgment on the remaining four counts. Shortly thereafter, the Authority passed an identical tax ordinance because of *ultra vires* concerns about the first ordinance raised by the plaintiffs. Plaintiffs filed an identical complaint against the second ordinance, but eliminated the *ultra vires* challenge. The trial court disposed of the second complaint in the same manner as

the first. Plaintiffs appealed, and made a Rule 302(b) motion to this court (134 Ill. 2d R. 302(b)). We granted the motion and consolidated all of the appeals.

The Act authorizes the construction of a new McCormick Place Exhibition Hall, the renovation of existing McCormick Place facilities, the construction of a concourse connecting these facilities, and the construction of related infrastructure projects. We will refer to all of these improvements collectively as "the Expansion Project."

In order to finance the Expansion Project, the Act grants the Authority the power to issue bonds in the amount of $987 million. In order to fund the bonds, the Act directs the Authority to impose by ordinance certain taxes, including the tax at issue in this case.

The tax is a retailers' occupation tax, which is imposed on two types of food and beverage sales. First, it is imposed on all sales of food and beverages to be consumed on the premises where sold. Second, it applies to sales of food and beverages sold for consumption off the premises when sold by a restaurant or full service bar. Restaurants and full service bars are defined as retailers whose principal source of gross receipts is from the sale of food and beverages prepared for immediate consumption. The tax is imposed at the rate of 1%, and is imposed on the three geographic areas that the General Assembly determined would directly benefit from the Expansion Project. These are referred to as tax subdistricts.

We find no merit to any of the plaintiffs' arguments. Consequently, we affirm the trial court.

### The Uniformity Clause

Plaintiffs' first claim is that the tax violates the uniformity clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, §2). Plaintiffs claim that the trial

court erred when it granted the Authority's motion for summary judgment.

The uniformity clause states that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." (Ill. Const. 1970, art. IX, §2.) Plaintiffs also allege that the tax violates the equal protection clause of the United States Constitution. However, the uniformity clause was intended to encompass the equal protection clause and add to it even more limitations on government. (*Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, 466-68.) If a tax is constitutional under the uniformity clause, it inherently fulfills the requirements of the equal protection clause. Therefore, we confine our discussion to the uniformity clause.

It is well established that a classification of a non-property tax must be based on a real and substantial difference between the people taxed and not taxed, and must bear some reasonable relationship to the object of the legislation or to public policy. *Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, 468 (the *Searle* test). See also *People ex rel. Holland Coal Co. v. Isaacs* (1961), 22 Ill. 2d 477, 480.

The appellants contend that the tax fails the *Searle* test in three ways. First, they challenge the geographic lines drawn by the General Assembly. The purpose behind the Act was to benefit all residents of Cook County, but the Act only directly benefits 2% of those taxed. They argue that there is no rational basis for taxing only restaurants within the taxing subdistrict; the tax should apply either to the entire county or only to the small number of direct beneficiaries. The tax subdistricts represent an unconstitutional middleground.

Second, plaintiffs challenge the manner in which the tax defines the types of food and beverage sales to be taxed. Restaurants and full service bars are taxed on all food and beverages, including carry-out food. However, the very same food and beverages are not taxed when purchased for carry-out at any other type of establishment. Plaintiffs contend that this is unconstitutional because there is no rational basis for this distinction. Finally, plaintiffs argue that the tax is unconstitutional as a retailers' occupation tax because there is no reason why a tax designed to support the Expansion Project should apply to restaurants but not to other types of retail businesses.

We will address each of plaintiffs' arguments in turn. However, we preface this discussion by noting the relatively narrow scope of the court's inquiry when a tax has been challenged on uniformity grounds. Statutes are presumed constitutional, and broad latitude is afforded to legislative classifications for taxing purposes. A plaintiff challenging such a classification has the burden of showing that it is arbitrary or unreasonable; if a state of facts can be reasonably conceived that would sustain it, the classification must be upheld. *Illinois Gasoline Dealers Association v. City of Chicago* (1988), 119 Ill. 2d 391, 403.

We also note that the burdens placed on each party by *Illinois Gasoline*, in conjunction with *Searle*, may not be entirely clear, and we clarify them today. A plaintiff is not required to come forward with any and all conceivable explanations for the tax and then prove each one unreasonable; this was specifically rejected in *Searle*, 117 Ill. 2d at 468. Rather, these cases stand for the proposition that, upon a good-faith uniformity challenge, a taxing body must produce a justification for its classifications. The plaintiff then has the burden to persuade the court that the defendant's explanation is insufficient

as a matter of law, or unsupported by the facts, to satisfy the *Searle* test. If the plaintiff is unable to do this, judgment is proper as a matter of law. As we shall see, plaintiffs fail to meet their burden of persuasion with any of their three challenges.

Plaintiffs' first challenge is that the geographic lines of the taxing district were drawn unconstitutionally. Plaintiffs argue alternatively that the district was drawn either too small or too big.

Plaintiffs argue that the taxing district is too small because the expansion project will benefit the entire county, according to a study performed by KPMG Peat Marwick (the Peat Marwick Study). This study offered projections of the gross economic activity that the Expansion Project would generate in Cook County. Therefore, they argue, the Expansion Project should be financed by the entire county, and not just by those inside arbitrarily drawn lines.

In the alternative, plaintiffs argue that the taxing district is too big. For this they rely on the study performed by Coopers and Lybrand (the Coopers Study), which, they argue, showed that only 260 of the 14,000 establishments taxed will directly benefit from the Project. Thus, 98% of the class taxed will derive no benefit whatsoever, but are significantly burdened by the tax. This discrepancy, they argue, is unconstitutional.

We reject both arguments. First, there is a reasonable basis for limiting the taxing district as the General Assembly did instead of taxing the entire county. The likelihood that a restaurant will benefit from an increase in out-of-town visitors depends to a certain extent on where it is located. This is supported by both the Coopers Study and the Peat Marwick Study.

Regarding the Coopers Study, the findings of the trial judge, Judge Arkiss, are pertinent:

"[T]hrough the McCormick Place Restaurant Reservation Booth records, Coopers obtained hard data regarding the actual restaurant choices made by 37,302 trade show attendees. Of those reservations, 86.9% were placed at restaurants located within the downtown tax subdistrict. Once again, plaintiffs suggest that the sample is limited despite the very large numbers sampled. But again, plaintiffs fail to offer any reason why the sample is not representative. Plaintiffs do not even attempt to explain away the evidence which shows that the studied trade show attendees displayed an almost universal preference for restaurants located within the downtown tax subdistrict; nor do plaintiffs offer any theory as to why other trade show attendees would follow any other geographic pattern. Indeed, [Michael Schatt, the man who prepared the Study] testified that there was nothing in the data to indicate that the 37,302 reservations studied by Coopers were not representative of where all trade show attendees go for meals.

In short, it seems that plaintiffs expect the court to reject the compelling data compiled by Coopers simply because Coopers did not measure every food and beverage purchase made by McCormick Place visitors. In the absence of any reason to doubt the unmistakable geographic trends reflected in the Coopers data, and in light of plaintiffs' failure to offer any contrary evidence, the evidence submitted by Coopers amply demonstrates that the boundaries of the downtown tax district identify an area of the city where nonresident visitors to McCormick Place are overwhelmingly likely to go for meals."

Plaintiffs' challenge that the Peat Marwick Study shows that the entire county would benefit falls short. It is true that the Peat Marwick Study offered projections as to the gross economic activity, direct and indirect, that the Expansion Project would generate in Cook County. However, it did not predict *where* in Cook County the dollars would be spent. The General Assembly could reasonably conclude that the direct beneficiaries would be those within the taxing subdistrict, and

plaintiffs have not produced anything to suggest that narrowing the taxed area in this fashion was unreasonable.

The Authority has also articulated a reasonable basis for not limiting the tax to the 260 restaurants that plaintiffs contend will receive the lion's share of the benefits. The Authority correctly contends that plaintiffs' argument that the tax should be so limited comes from a misreading of the Coopers Study.

The parties stipulated that there are approximately 14,000 establishments located in the taxing district that will be subject to the tax. Plaintiffs cite the identification in the Coopers Study of 260 restaurants that received reservations from the McCormick Place Restaurant Reservation Booth, which they assert are the only establishments that would directly benefit from the Expansion Project.

The plaintiffs' reading is untenable. Nowhere does the Cooper Study suggest, let alone conclude, that McCormick Place attendees are likely to limit their food and beverage purchases to the 260 establishments mentioned. Schatt explicitly testified that he had no reason to believe that the choices made by McCormick Place visitors were so limited.

To the contrary, there is every reason to believe that McCormick Place visitors do not limit their selections to these restaurants. According to Schatt's testimony, the Illinois Restaurant Association estimated that about 30% of downtown restaurant business is attributable to nonresidents or tourists. The Peat Marwick Study estimated that attendees would spend another $132 million per year on food as a result of the Expansion Project. Contrary to the plaintiffs' assertions, we do not believe that these benefits will flow to only 260 restaurants.

In fact, the 260 identified restaurants are of limited significance. They represent nothing more than the only

establishments in the taxing subdistrict that Coopers and Lybrand was able to track using reservations made through the Reservation Booth. The Coopers Study could not identify restaurants that visitors selected using other means. Thus, eliminated from the Coopers list were most breakfast and lunch places, fast food restaurants, taverns, night clubs, and restaurants where visitors either visited without reservations or made their own reservations. It is not unreasonable to conclude, however, that these places are patronized by conventioneers. Indeed, precisely because specific data on the actual restaurants chosen by McCormick Place visitors were so limited, Coopers sought to verify the geographic pattern of selection by consulting other sources, including guidebooks, concierge surveys and trade show sponsor surveys. These sources indicated that visitors generally patronize restaurants in the taxing district. Plaintiffs again fail to demonstrate that the taxing district was unreasonable.

Plaintiffs' arguments boil down to mere assertions that they can draw better taxing lines than the General Assembly. However, in a uniformity clause challenge the court is not required to have proof of perfect rationality as to each and every taxpayer. The uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers. These standards have been met in the instant case.

Plaintiffs' second challenge is that the tax violates the uniformity clause because it is imposed on the sale of carry-out food purchased at restaurants, which are defined as businesses that derive the majority of their gross receipts from the sale of food and beverages for on-premises consumption, while excluding the sale of the very same carry-out food from places such as grocery

stores. They argue that there is "no rhyme or reason for this distinction."

However, the Authority has offered an entirely plausible reason for this distinction, and again, plaintiffs fail to rebut it. The classification targets the types of food service establishments likely to benefit from increased convention trade and the types of food purchases likely to be made by conventioneers. Nonresident trade show attendees, staying in hotels, depend on full service restaurants for their meals. It is fair to presume that they do not cook meals in their rooms. Accordingly, the tax focuses on the types of establishments that receive the bulk of the convention trade, namely, full service bars and restaurants. Businesses that do not receive the majority of their revenue from the sale of food and beverages for on-premises consumption, for instance grocery stores, are not likely to see an appreciable increase in the business as a result of the project. Simply put, out-of-town visitors are highly unlikely to buy a substantial amount of groceries while staying in Chicago. Once again, there is a real and substantial difference between those taxed and not taxed, which bears a reasonable relation to the legislation. The *Searle* test is satisfied.

Plaintiffs' final challenge is that the tax is unconstitutional because, although denominated a retailers' occupation tax, it will not be imposed on all retailers or even on all retail sales of comestibles. Rather, it will only be imposed on sales by a limited group of sellers and sales for on-premise consumption. This, they argue, violates the uniformity clause.

Plaintiffs' argument does not withstand analysis. It is well settled that a municipality is able to limit the class of persons taxed to those likely to benefit directly from a particular project while exempting those who will benefit only indirectly. (*Coryn v. City of Moline* (1978), 71 Ill. 2d 194, 202.) *Coryn* involved a challenge to a city's tax on a

"special service area" in order to finance the construction of a shopping mall. A property owner claimed that the whole city should be taxed, rather than the small taxing district, since the entire city would benefit. This court rejected this argument, holding that the special service area was proper so long as the project could have reasonably been expected to make the area chosen a better place in which to reside or conduct business.

Although *Coryn* involved a different type of tax than in the instant case, the principle is the same. Where taxes are imposed based on the benefits realized by a particular group, the taxing body is not required to tax everyone who may receive a benefit, no matter how indirect. Instead, the taxing body may decide to tax only those who are likely to benefit in a direct and immediate way.

Of course, the taxing body's classification must satisfy the *Searle* test. As we have demonstrated, the classification in the instant case meets this requirement. The Authority has demonstrated in several ways a real and substantial difference between those taxed and those not taxed, and the tax on the increased benefits bears not only a reasonable relationship but a direct relationship to the source of those benefits. The tax does not violate the uniformity clause, and summary judgment was appropriate.

## The Commerce Clause

Plaintiffs next argue that the trial court erred when it found that the tax does not violate the interstate commerce clause (U.S. Const., art. I, §8), and therefore entered judgment on the pleadings. They argue that the tax targets, and therefore discriminates against, nonresidents. In addition, it confers a competitive advantage on local businesses which will not attract increased interstate consumers. Therefore, they argue, the tax places

an undue burden on interstate commerce, and is constitutionally infirm.

The United States Supreme Court has articulated four criteria that a State tax on nonresidents must meet to save it from a commerce clause challenge. "[A] state tax is not *per se* invalid because it burdens interstate commerce since interstate commerce may constitutionally be made to pay its way. [Citations.] The State's right to tax interstate commerce is limited, however, and no state tax may be sustained unless the tax: (1) has a substantial nexus with the State; (2) is fairly apportioned; (3) does not discriminate against interstate commerce; and (4) is fairly related to the services provided by the State. [Citation.]" *Maryland v. Louisiana* (1981), 451 U.S. 725, 754, 68 L. Ed. 2d 576, 600, 101 S. Ct. 2114, 2133.

These four requirements are satisfied here. First, the retail sale of food for on-premises consumption has a substantial nexus to the State of Illinois, since it occurs entirely within the State. Second, the tax is fairly apportioned, as it taxes only those who sell (or buy, if the tax is passed on to the consumer) comestibles, and there is no risk that any other State will tax the sale. Where there is no risk of multiple taxation by more than one State, the tax is inherently fairly apportioned. See *Goldberg v. Johnson* (1987), 117 Ill. 2d 493, 501-02, *aff'd* (1989), 488 U.S. 252, 102 L. Ed. 2d 607, 109 S. Ct. 582. See also *Tyler Pipe Industries, Inc. v. Washington State Department of Revenue* (1987), 483 U.S. 232, 251, 97 L. Ed. 2d 199, 216, 107 S. Ct. 2810, 2822; *Standard Pressed Steel Co. v. Department of Revenue* (1975), 419 U.S. 560, 562-64, 42 L. Ed. 2d 719, 722-24, 95 S. Ct. 706, 708-09.

Third, the tax does not discriminate against interstate commerce. Here again we are concerned with multiple taxation. "Where no other taxing body can levy the

tax being challenged, it is clear that there is no risk of multiple taxation and, consequently, no discrimination against interstate commerce." (*Goldberg*, 117 Ill. 2d at 502.) Again, there is no possibility of multiple taxation, and therefore the third prong is satisfied.

Finally, the tax is related to services provided by the State of Illinois. This requirement is satisfied if the person taxed receives "police and fire protection, the use of public roads and mass transit, and other advantages of civilized society." (*Goldberg v. Sweet* (1989), 488 U.S. 252, 267, 102 L. Ed. 2d 607, 621, 109 S. Ct. 582, 592.) Clearly, conventioneers receive these services. Thus, the tax is entirely related to these services.

Plaintiffs' argument is based upon a flawed understanding of the goals that the commerce clause was meant to achieve. "[T]he Commerce Clause prohibits economic protectionism—that is, regulatory measures designed to benefit in-state economic interests by burdening out-of-state competitors." (*New Energy Co. v. Limbach* (1988), 486 U.S. 269, 273-74, 100 L. Ed. 2d 302, 308, 108 S. Ct. 1803, 1807.) "It is not a purpose of the Commerce Clause to protect state residents from their own state taxes." (*Goldberg v. Sweet* (1989), 488 U.S. 252, 266, 102 L. Ed. 2d 607, 620, 109 S. Ct. 582, 591.) Thus, the class protected by the commerce clause is *competitors*, not consumers (although ultimately consumers will be better off because of it). No doubt that, by raising taxes on in-State businesses, Illinois hardly deals a blow to its out-of-State counterparts. The tax does not violate the commerce clause.

## The Single Subject Requirement

The Illinois Constitution prohibits legislation on more than a single subject. "Bills, except bills for appropriations and for the codification, revision or rearrangement of laws, shall be confined to one subject." (Ill. Const.

1970, art. IV, §8(d).) Plaintiffs contend that the Act as it was passed violated this requirement in two ways. First, the infrastructure improvements authorized by the Act, which include a major rerouting of Lake Shore Drive to the north of McCormick Place, are unrelated to the single purpose of the Authority, which is to provide pier and exposition facilities and services. Second, the Act provides for any excess revenues obtained by the Sports Facilities Authority to go to the defendant Authority. The Sports Facilities Authority was created to construct and finance the new Comiskey Park pursuant to the Sports Facilities Authority Act. Plaintiffs argue that the Act in the instant case causes the Illinois Sports Facilities Authority Act (Ill. Rev. Stat. 1989, ch. 85, par. 6001 *et seq.*) to violate the single subject requirement. The trial court therefore erred when it entered judgment on the pleadings against them.

Both of plaintiffs' arguments must be rejected, as they spring from a far too broad interpretation of the single subject requirement. Nowhere does the Constitution limit the powers of any local government entity created by the General Assembly to a single subject. Nor does the Constitution prohibit the amendment of a statute that has already been codified to include a second subject. Rather, the Constitution simply limits the types of bills that the General Assembly can pass into law.

The purpose behind the single subject rule was " 'to prevent the abuses which inhered in an act containing heterogeneous matters. The primary purposes of the requirement that the body [of an act—as distinguished from its title] shall not embrace more than one subject is to prevent "log-rolling," to preclude the attachment of legislative "riders," and to insure an orderly legislative procedure.' " *Fuehrmeyer v. City of Chicago* (1974), 57 Ill. 2d 193, 201, quoting Notes and Recent Decisions, *State Statutes: The One-Subject Rule Under the 1970*

*Constitution,* 6 J. Marshall J. of Prac. & Proc. 359, 359-60 (1973).

What the Framers sought to do was avoid legislation being passed which, standing alone, could not muster the necessary votes for passage. What was *not* intended was to fetter the General Assembly by disallowing legislation that all agree had the required support, on the basis of legislation that had been adopted in the past. " 'The history and purpose of this constitutional provision are too well understood to require any elucidation at our hands. The practice of bringing together into one bill subjects diverse in their nature, and having no necessary connection, with a view to combine in their favor the advocates of all, and thus secure the passage of several measures, no one of which could succeed upon its own merits, was one both corruptive of the legislator and dangerous to the State.' " (*Fuehrmeyer,* 57 Ill. 2d at 202, quoting *People ex rel. Drake v. Mahaney* (1865), 13 Mich. 481, 494-95.) The Act had but one single subject: the Expansion Project. That it may have implicated statutes already in effect, and may have even added a second subject to these statutes, is of no consequence. The Act complies with the single subject requirement.

### The Enrolled Bill Doctrine

Plaintiffs next argue that we should overturn the tax because the General Assembly did not comply with constitutionally required procedures when it passed the Act. Specifically, the General Assembly did not comply with the three-readings requirement of article IV, section 8(d), of the Illinois Constitution.

The Authority does not dispute that the three-readings requirement was violated. Rather, it urges us to reaffirm our adherence to the longstanding enrolled bill doctrine. That doctrine flows out of the language in article IV, section 8(d), which says "[t]he Speaker of the

House of Representatives and the President of the Senate shall sign each bill that passes both houses to certify that the procedural requirements for passage have been met." (Ill. Const. 1970, art. IV, §8(d).) This court has interpreted this language to mean that, upon certification by the Speaker and the Senate President, a bill is conclusively presumed to have met all procedural requirements for passage. *Fuehrmeyer v. City of Chicago* (1974), 57 Ill. 2d 193, 198; *Polich v. Chicago School Finance Authority* (1980), 79 Ill. 2d 188, 208-12.

Two things are clear to the members of this court. The first is that, contrary to plaintiffs' assertion, the enrolled bill doctrine was clearly anticipated by the Framers of the Constitution. As noted in *Benjamin v. Devon Bank* (1977), 68 Ill. 2d 142, 145-46, the Committee on the Legislature of the constitutional convention explained that the purpose of the enrolled bill doctrine is to avoid judicial nullification of statutes on purely procedural grounds:

> " 'Presently Illinois has the "journal entry" rule as distinguished from an "enrolled bill" rule. It is proposed that Illinois adopt the "enrolled bill" rule.
>
> The "journal entry" rule means that a piece of legislation can be challenged in the courts by pointing to a defect in its passage as reflected in the journal. Under this rule, a statute duely [*sic*] passed by the General Assembly and signed by the Governor may be attacked in the courts, not necessarily on its merits, but on some procedural error or technicality found in the legislative process. The "journal entry" rule, as a result, leads to complex litigation over procedures and technicalities.
>
> The "enrolled bill" rule would provide that when the presiding officers of the two houses sign a bill, their signatures become conclusive proof that all constitutional procedures have been properly followed. The "enrolled bill" rule would not permit a challenge to a bill on procedural or technical grounds regarding the manner of passage if the bill showed on its face that it was properly

passed. Signatures by the presiding officers would, of course, constitute proof that proper procedures were followed.' " *Benjamin*, 68 Ill. 2d at 145, quoting 6 Record of Proceedings, Sixth Illinois Constitutional Convention 1386-87 (hereinafter cited as Proceedings).

The second thing that is apparent to this court is that the General Assembly has shown remarkably poor self-discipline in policing itself. Indeed, both parties agree that ignoring the three-readings requirement has become a procedural regularity. This is quite a different situation than that envisioned by the Framers, who enacted the enrolled bill doctrine on the assumption that the General Assembly would police itself and judicial review would not be needed because violations of the constitutionally required procedures would be rare. "[W]e determined, in accordance with many other states that have adopted the enrolled bill rule and have found no difficulties, that *** if they were to commit any fraud or chicanery, the legislature would certainly take care of them." 4 Proceedings 2881.

Plaintiffs urge us to abandon the enrolled bill doctrine because history has proven that there is no other way to enforce the constitutionally mandated three-readings requirement. While plaintiffs make a persuasive argument, we decline their invitation. We do so because, for today at least, we feel that the doctrine of separation of powers is more compelling. However, we defer to the legislature hesitantly, because we do not wish to understate the importance of complying with the Constitution when passing bills. If the General Assembly continues its poor record of policing itself, we reserve the right to revisit this issue on another day to decide the continued propriety of ignoring this constitutional violation.

## State Guarantee of Bonds

Plaintiffs also contend that the Act constitutes a

State guarantee of the bonds to be issued by the Authority, and therefore required a three-fifths vote for passage under article IX, section 9(b), of the Illinois Constitution. Because the Act was passed by a simple majority, they argue, the entire Act is invalid. We disagree that the State has guaranteed the bonds.

Under the Act, all of the local Expansion Project taxes (as well as any excess funds from the Illinois Sports Facilities Authority Act) are collected and held in a trust fund which is outside the State treasury. Every year the chairman of the Authority certifies how much will be necessary to pay debt service on the bonds. The General Assembly may appropriate the amount certified, and if it does, then the money flows into the McCormick Place Expansion Project Fund inside the State treasury.

The dispositive word here is "may" in "may appropriate." The Act contemplates that the General Assembly will decide each year whether to appropriate the necessary amount. The General Assembly would be well within its discretion if it decided not to appropriate any money at all. Moreover, the Act requires the Authority to print a disclaimer on the face of the bonds, specifically stating that there is no State guarantee: "The State shall not be liable on bonds of the Authority issued under this Section, those bonds shall not be a debt of the State, and this Act shall not be construed as a guarantee by the State of the debts of the Authority. The bonds shall contain a statement to this effect on the face of the bonds." Pub. Act 87–733, eff. July 1, 1992 (adding section 13.2 to the Metropolitan Pier and Exposition Authority Act); 1991 Ill. Laws 3636, 3667.

Plaintiffs' argument necessarily relies on a broader construction of the word "guarantee" than ordinary usage. Plaintiffs suggest that, as used in article IX, "guarantee" should be interpreted to mean when "a rational investor would believe that the State of Illinois has

stepped up, in a way that it certainly was not required to, to make sure (*i.e.* to guarantee) that the [Authority's] debt would be paid." Plaintiffs go on to suggest that if the marketplace reacts as if the State has guaranteed the bonds, there has been a *de facto* guarantee.

We decline to give the term "guarantee" such an unclear and amorphous definition. We note that reliance on the marketplace's reaction to bonds would create a situation where the presence of a guarantee, and therefore the required number of votes for passage, is unclear until after a bill is passed. Such a reading is beyond the plain and commonly understood meaning of the term, the standard used when construing constitutional provisions absent a clear intent for a contrary meaning. *Coalition for Political Honesty v. State Board of Elections* (1976), 65 Ill. 2d 453, 464.

Finally, we note that, under the circumstances in this case, such a reading would not help plaintiffs in any event. Given the notice that any bondholder receives from the face of the bond certificate and the Act itself, as well as today's opinion, it can hardly be said that a rational bondholder would understand his bond to be backed by a guarantee of the State. Thus, even under plaintiffs' broad definition, the State has guaranteed nothing, and a simple majority was sufficient to pass the Act.

## Plaintiffs' Other Arguments

Plaintiffs make three other arguments, all of which may be disposed of summarily. First, they argue that the original tax ordinance passed by the Authority violated article VII, section 8, of the Illinois Constitution. This is because, according to plaintiffs, the Authority had not yet been granted the authority to pass the tax. However, the Authority passed an identical ordinance in July, in anticipation of such an attack. Plaintiffs concede that

this second àct was not *ultra vires*; consequently, a ruling on the propriety of the first ordinance could not grant plaintiffs any form of relief. We therefore need not resolve that issue.

Plaintiffs also argue that the Act violates article IV, section 13, of the Illinois Constitution, which prohibits local legislation. This is because the General Assembly added the power to "quick take" property within a defined area (the site) to the Authority's general eminent domain power. Plaintiffs and defendant disagree whether this is impermissible special legislation. However, we need not decide this issue because, as plaintiffs admit, none of them owns property within the site. Consequently, they do not have standing to raise the issue.

Finally, plaintiffs argue that the Act violates article VIII, section 1, of the Illinois Constitution, which provides that "[p]ublic funds, property or credit shall be used only for public purposes." Plaintiffs do not argue that the Expansion Project is not a public purpose. Rather, they argue that, if they can show that the other Expansion Fund taxes are likely to be enough to pay the debt service on the bonds, then a court should strike down the tax on the ground that it constitutes excessive taxation.

To support this argument, plaintiffs cite a number of cases involving taxing bodies that had accumulated a surplus of money and were attempting to collect even more taxes. (*Central Illinois Public Service Co. v. Miller* (1969), 42 Ill. 2d 542; *People ex rel. Kramer v. Chicago, Burlington & Quincy R.R. Co.* (1956), 8 Ill. 2d 382; *People ex rel. Bergan v. New York Central R.R. Co.* (1945), 390 Ill. 30; *People ex rel. Ross v. Chicago, Milwaukee, St. Paul & Pacific R.R. Co.* (1942), 381 Ill. 58.) These cases are inapplicable here because we are faced not with a surplus, but rather a prediction of a surplus. We reaffirm the principle that these cases expound, namely

that it is unconstitutional to impose unnecessary taxes. However, we decline to expand the rule to allow discovery anytime a plaintiff surmises that a tax may cause coffers to overflow in the future.

### Conclusion

For the reasons set forth in this opinion, the trial court's decision is affirmed in its entirety.

*Affirmed.*