NORTH POLE CORPORATION, Plaintiff-Appellant, v. THE VILLAGE OF EAST DUNDEE, Defendant-Appellee.

Second District    No. 2—93—0655

Opinion filed June 10, 1994.

William A. Von Hoene, Jr., and Janice A. Hornaday, both of Jenner & Block, of Chicago, and Alfred Y. Kirkland, Jr., of Brady, McQueen, Martin, Collins & Jensen, of Elgin, for appellant.

John E. Regan, of Early, Collison, Tousey, Regan & Farrell, of Elgin, for appellee.

JUSTICE McLAREN delivered the opinion of the court:
Plaintiff, North Pole Corporation, sued for a declaratory judgment

that an amusement tax enacted by defendant, the Village of East Dundee (the Village), is unconstitutional and void. Plaintiff appeals interlocutorily (134 Ill. 2d R. 307(a)) the denial of a preliminary injunction that would prevent the enforcement or collection of the tax pending the outcome of the litigation. On appeal, plaintiff argues that the trial court abused its discretion in denying it preliminary injunctive relief. We affirm.

Plaintiff is a for-profit corporation that operates an amusement park, the Three Worlds of Santa's Village, within the corporate limits of East Dundee, a non-home-rule municipality. On May 3, 1993, the village enacted Ordinance No. 93—5, effective June 1, 1993, imposing a 5% tax on the admission charge paid by "every person who pays a charge for admission to an Amusement" within defendant's corporate limits. The tax is to be collected from the consumer at the time the admission charge is collected. Every person who receives an admission charge on which a tax is levied per the ordinance has a duty to act as trustee for defendant and to pay proceeds from the tax to the Village treasurer. The Village may suspend or revoke the Village licenses of amusement operators who willfully fail to turn over proceeds from the tax.

The ordinance defines "amusement" as "any theatrical, dramatic or musical performance, circus, rodeo, animal act, athletic contest, sport, or similar exhibition or activity in which an attendee participates" and for which there is an admission fee or other charge for spectators or participants. Amusements staged by federally tax-exempt nonprofit organizations, school districts, or governmental entities are exempt from the tax. There is no dispute that plaintiff's business is an "amusement" under the ordinance.

Plaintiff's four-count complaint for declaratory and injunctive relief alleges the following facts. The Three Worlds of Santa's Village consists of Santa's Village, an amusement park and picnic area; Racing Rapids, a water park; and the Polar Dome, an ice-skating rink. Santa's Village and Racing Rapids, which operate primarily in the summer, each charge an admission fee to the public. In 1992, this charge was $10.95 per person per visit, or $15.95 per person per visit for admission to both attractions. The Polar Dome charges $4.50 per person for admission. Because of the weak economy, these charges have not gone up for the last several years even though plaintiff has experienced operating losses.

According to the complaint, plaintiff already pays substantial Village taxes (about $27,000 in 1992) even though plaintiff uses few Village services. Plaintiff requires no extraordinary police or fire ser-

vices, does not receive garbage collection service from the Village, and, in 1992, reimbursed the Village about $26,000 for water and sewage service.

The complaint alleges further that, although the ordinance is phrased generally to apply to all "amusements," remarks of Village trustees demonstrate that the Village enacted the ordinance in the realization that plaintiff would be the only entity that would in fact be subject to the tax. Also, although the ordinance does not specify any particular use for the funds collected thereunder, the purpose of the tax, as evidenced by remarks by Village trustees, was to raise money to finance a new sewage treatment plant. This capital improvement will benefit all the inhabitants and businesses of East Dundee and will confer no special benefit on plaintiff.

According to the complaint, the new tax will severely increase plaintiff's municipal tax burden. The chairman of the Village finance committee estimated that plaintiff will pay an extra $170,000 annually under the ordinance; thus, its tax liability would increase by 500% to 600% over the previous year. The extra liability would harm plaintiff, which could either absorb the charge or raise ticket prices and thereby lower attendance and revenues in its extremely price-sensitive market.

According to the complaint, the amusements tax is invalid for several reasons. First, because the tax requires plaintiff to bear the entire burden of the tax without receiving any remotely proportional corresponding benefit, the tax violates Federal and State guarantees of equal protection. (U.S. Const., amend. XIV; Ill. Const. 1970, art. I, § 2.) Second, this alleged discrimination violates the uniformity clause of the Illinois Constitution. (Ill. Const. 1970, art. IX, § 2.) Third, because the ordinance requires plaintiff to bear a disproportionate share of the cost of the capital improvement for which the tax revenues are intended, it is an impermissible special assessment. 65 ILCS 5/9—2—45 (West 1992).

In moving for preliminary injunctive relief, plaintiff alleged that, without a preliminary injunction forbidding the collection of the tax until this suit was resolved, plaintiff would suffer irreparable injury for which it had no adequate remedy at law. The increased price of admission would result in greatly reduced attendance and thus lower revenues in this highly price-sensitive market. The loss of customers and goodwill could not readily be quantified. Also, if the court later invalidated the tax, plaintiff would have no efficient means to return the improper charges to its patrons. For this latter reason, the balance of equities also supported granting a preliminary injunction; if the Village prevailed on the merits of the suit after the collection of

the tax was preliminarily enjoined, plaintiff's attendance records would enable it to calculate easily how much money was due.

The court held a hearing on the motion for a preliminary injunction. Plaintiff's first witness was Philip Oestreich, executive vice-president and 50% owner (with Hugh Wilson owning the other 50%) of plaintiff. Oestreich testified that plaintiff's revenue comes primarily from the standard admission charge for Santa's Village and Racing Rapids of $10.95 per person (or $15.95 for a combined ticket), although plaintiff also negotiates per-person prices with customers for large picnic outings on its grounds. In 1989, the prices for a single ticket and a combined ticket were, respectively, $8.95 and $13.95; for the 1990 season, $9.95 and $14.95; and, for the last three seasons (including the 1993 season, which started at about the time of the hearing), $10.95 and $15.95.

Oestreich explained that plaintiff had foregone price increases for the last three years because amusement operators and their customers are very price conscious. Increased admission charges mean substantially fewer customers at the new prices. Referring to daily record figures for Santa's Village only, Oestreich noted that paid admission fell from about $279,000 in 1989 to about $245,000 in 1990, and to about $227,000 in 1991, each decrease following a $1 increase in ticket prices. In 1992, with no price increase, revenues stopped declining, amounting to about $232,000. Although the weakness in the overall economy played some role in the trend toward lower attendance, Oestreich believed that the dropoffs in attendance were due mainly to ticket price increases. Oestreich opined that, like the price increases, the new tax would decrease attendance at plaintiff's business, especially because customers would be angry to learn of a new charge that arose after plaintiff's brochures for the upcoming season had been printed.

Oestreich testified further that in recent years plaintiff has lost money, resulting in layoffs of some full-time personnel and some transfer to full-time personnel of responsibilities that were handled previously by part-time workers. Plaintiff's consolidated financial statements, which were admitted into evidence at the hearing, stated that, in the fiscal year ending April 30, 1992, plaintiff lost $136,548. Plaintiff made $87,152 in the previous fiscal year and lost $183,553 in the fiscal year before that. Consolidated financial statements for the fiscal year ending April 30, 1993, had not been prepared by the time of the hearing, but Oestreich expected plaintiff to break even or incur a slight loss. Because plaintiff's finances were already precarious, it could not simply absorb the new charge; admission prices would have to rise. Any price increase would hurt business,

not only because demand was so sensitive to price, but also because Kiddieland, one of plaintiff's leading competitors, currently charged the same $10.95 admission fee.

Using financial records that were later admitted into evidence, Oestreich summarized plaintiff's tax and license payments to the Village and Village-related entities for 1992. These payments totaled $41,197, excluding about $25,000 in "as-used" payments for water and sewage services. They included the Village's share of State sales taxes and utility bills, amusement device license fees, payments to the school district, and a liquor license fee. For the fiscal year ending April 30, 1992, plaintiff's gross admissions revenue was about $3,283,000; a 5% charge on this amount would have yielded the Village about $164,000, or approximately four times the total yearly taxes and fees plaintiff now paid to the Village.

Oestreich acknowledged that plaintiff uses Village services such as those of the police and fire departments. However, the Village police do not provide traffic guidance except on very rare occasions when events such as large picnics bring extraordinarily heavy traffic. The police check out alarms and apparent break-ins, but plaintiff pays for each false alarm. About 12 times a year plaintiff uses fire department ambulance and paramedic services for medical emergencies that its own 11-person emergency medical staff cannot handle alone. The Village provides no garbage collection, so plaintiff pays for this service directly. The Village charges "as-used" fees for the water and sewage services it provides plaintiff. Oestreich opined that the new amusement tax unfairly singles out plaintiff, given how much plaintiff already pays in taxes and that the new sewage treatment plant (which the tax would finance) would confer no special benefit on plaintiff vis-a-vis the general public.

Plaintiff next called Village administrator David Smith, who acknowledged that, as part of his duties, he wrote a letter to Oestreich advising Oestreich that plaintiff would be subject to the amusement tax. Smith admitted that the Village had advised no entity other than plaintiff of liability for the new tax. To Smith's knowledge, plaintiff was currently the only "amusement" subject to the ordinance.

Smith testified that money from the amusement tax would go into the Village's general revenue fund. Although the Village was contemplating the construction of a new sewage treatment plan, the revenue from the tax would not be earmarked for that or any other specific purpose. Also, the new sewage plant was not the only possible municipal capital improvement that was currently under discussion. Smith conceded that plaintiff would be only one of many entities that

would benefit from such improvements and that the Village was not considering taxes on other entities that would so benefit.

Plaintiff's final witness was Robert Albrecht, a member of the Village's board of trustees and the current chairman of the board's finance committee. Albrecht stated that, at the time of the hearing, plaintiff was the only entity that would be affected by the new tax. Even before the ordinance passed, everyone on the board realized that plaintiff was the sole taxable "amusement" under the ordinance. Albrecht estimated that the amusement tax would raise $170,000 in fiscal year 1993-94; the 8% video rental tax would raise about $40,000.

Albrecht explained that the board's recent perception that it would have to raise more revenue resulted partly, but not wholly, from the need to build and finance a new sewage system. Village revenues had declined because of restrictions on real estate taxation and because sales tax revenue had dropped off as the economy weakened. Also, the surcharge on the State income tax might soon be eliminated. The Village is required to balance its budget, and the pressure on the budget prompted the new taxes.

The Village's sole witness was David Smith. As Village administrator, Smith, in conjunction with the various department heads, prepared annual budget requests to submit to the board of trustees via the board's finance committee. Each request reviews possible revenue sources, including real estate taxes, utility taxes, a sales tax, miscellaneous license and permit revenues, the surcharge on the State income tax, and water and sewer user fees. Revenues from all of these sources (except the water and sewer fees) are commingled in the same general revenue fund.

Smith explained the recent developments that had led the Village to seek new sources of money. Building a new sewage treatment plant, which the Village had been studying for at least three years, was likely because the Illinois Environmental Protection Agency had placed the existing plant on "critical review status." The plant was using about 80% of its capacity; when that figure reached 90%, the agency would put it on restricted capacity, meaning no further connections to the sewer system could be made. The Village may not expand the current plant, which is in a floodplain.

The new sewage treatment plan was not the only capital project the Village was considering. The Village might have to build a new public works facility and a new and larger town hall to take the place of the existing one, which was built in 1894. The projects under consideration would benefit all the inhabitants of East Dundee and not merely plaintiff. Smith explained that the finance committee had already reviewed a wide variety of possible revenue sources. About a

year and a half before it passed the amusement tax, the Village adopted a vehicle lease and rental occupation tax. Smith agreed with plaintiff's counsel that plaintiff pays almost all of the various taxes that the Village now collects.

After receiving arguments of counsel, the trial court denied plaintiff's motion for a preliminary injunction. Plaintiff filed a timely notice of interlocutory appeal.

Plaintiff argues that the trial court erred in finding that plaintiff did not satisfy the prerequisites for a preliminary injunction against the operation of the amusement tax ordinance. Plaintiff and the Village reiterate the arguments they made at the trial level. Fundamentally, the parties differ on: (1) whether plaintiff raised a fair question of whether the amusement tax violates equal protection, the requirement of uniformity of taxation, or the prohibition on impermissible special assessments; and (2) whether the balance of hardships favors granting plaintiff preliminary injunctive relief from the Village's taxation power.

The purpose of a preliminary injunction is not to determine the merits of a case but to preserve the status quo pending a decision on the merits. (*Buzz Barton & Associates, Inc. v. Giannone* (1985), 108 Ill. 2d 373, 386; *LSBZ, Inc. v. Brokis* (1992), 237 Ill. App. 3d 415, 425.) The status quo is the last peaceable uncontested status that preceded the litigation. *Brokis*, 237 Ill. App. 3d at 424.

■ To obtain a preliminary injunction, a plaintiff must establish that: (1) he possesses a clearly ascertained right in need of protection; (2) he will suffer irreparable injury without the injunction; (3) there is no adequate remedy at law; and (4) there is a likelihood of success on the merits. In addition to considering these factors, the trial court must determine whether the balance of hardships to the parties supports a grant of preliminary injunctive relief. (*In re Adoption of Scraggs* (1988), 125 Ill. 2d 382, 388; *A.J. Dralle, Inc. v. Air Technologies, Inc.* (1994), 255 Ill. App. 3d 982, 989-90.) A reviewing court will not reverse the grant or denial of a preliminary injunction unless the trial court's decision is against the manifest weight of the evidence. *Reinhardt Printing Co. v. Feld* (1986), 142 Ill. App. 3d 9, 15.

We hold that the trial court's denial of the requested relief was not against the manifest weight of the evidence. The court had sufficient grounds to conclude that plaintiff had not demonstrated likelihood of success on the merits. In reaching this determination, we are cognizant that plaintiff was not required to meet the same burden of proof that will be required for it to prevail on the ultimate issue. (*Buzz Barton*, 108 Ill. 2d at 386.) Rather, plaintiff needed only to raise a fair question as to the existence of the right it claimed and

to lead the trial court to conclude that it would probably be entitled to the relief it sought if the proof sustained its allegations. (*Brokis*, 237 Ill. App. 3d at 425.) Nonetheless, we believe that the trial court properly found that plaintiff failed to make this showing.

■ Before proceeding to a more detailed discussion of the grounds of this appeal, we feel obligated to clarify a matter that may otherwise engender confusion. On both the trial and the appellate level, the parties have tended to characterize the ordinance as a tax on *plaintiff*, the proprietor of the Three Worlds of Santa's Village. However, the ordinance states that *the tax is to be levied on the patrons* (consumers) of this amusement. Properly speaking, *the taxpayers are the customers, not plaintiff*, although plaintiff has plausibly alleged that it will suffer injury in fact from the imposition of the tax. As the Village has never questioned plaintiff's standing to challenge the tax, we shall accept for purposes of this appeal that it may do so.

Plaintiff argues primarily that it raised a fair question that the amusement tax violates Federal and State guarantees of equal protection and the State guarantee of uniform taxation. Plaintiff's argument in each regard is similar. It maintains that the amusement tax is grossly discriminatory and oppressive because: (1) although the tax is facially applicable to any "amusements" within East Dundee, it is undisputed—and the Village has been aware at all times—that plaintiff is in fact the only "amusement" in East Dundee and thus the only "taxpayer" under the ordinance; (2) the tax imposes an enormous new burden on plaintiff, which already pays substantial Village taxes; and (3) the benefit from the tax is disproportionate to the burden in two respects. First, plaintiff will pay an amount that bears no reasonable relation to the added services that it will obtain (*e.g.*, the new sewage treatment plant). Second, plaintiff bears the whole burden of a tax from which it derives no benefit beyond that accruing to the inhabitants of East Dundee in general.

■ The parties agree that the ordinance neither burdens a fundamental right nor creates a suspect classification. In such a case, Federal and State guarantees of equal protection require only that there be a rational basis for the differential treatment of those taxed and those not taxed. (*Nordlinger v. Hahn* (1992), 505 U.S. 1, 10, 120 L. Ed. 2d 1, 12, 112 S. Ct. 2326, 2331-32; *Lehnhausen v. Lake Shore Auto Parts Co.* (1973), 410 U.S. 356, 359-60, 35 L. Ed. 2d 351, 354-55, 93 S. Ct. 1001, 1003-04; *Illinois Gasoline Dealers Association v. City of Chicago* (1988), 119 Ill. 2d 391, 403.) A classification for taxation purposes carries a strong presumption of validity, and it will survive a challenge on equal protection grounds unless the party

asserting the challenge negates every conceivable basis for the classification. *Lehnhausen*, 410 U.S. at 364, 35 L. Ed. 2d at 358, 93 S. Ct. at 1006.

■ The uniformity clause of the State Constitution provides that, "[i]n any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly." (Ill. Const. 1970, art. IX, § 2.) This clause sets greater limits on the legislature than does equal protection. (*Searle Pharmaceuticals, Inc. v. Department of Revenue* (1987), 117 Ill. 2d 454, 466-68.) Under the uniformity clause, a classification must be based on a real and substantial difference between those taxed and those not taxed and must bear some reasonable relationship to the object of the legislation or to public policy. *Geja's Cafe v. Metropolitan Pier & Exposition Authority* (1992), 153 Ill. 2d 239, 247.

We consider the equal protection and uniformity arguments together, as a tax that satisfies the uniformity clause necessarily also satisfies equal protection. *Geja's Cafe*, 153 Ill. 2d at 247.

■ We believe that the amusement tax offends neither uniformity nor equal protection as *it is directed against customers rather than against plaintiff.* Plaintiff does not argue that an amusement tax is unconstitutional or discriminatory merely because it taxes amusements and not other businesses or activities. Few if any taxes could survive scrutiny were such an argument available. Rather, plaintiff argues that the tax is unconstitutionally discriminatory and oppressive *because it singles out plaintiff as the sole taxpayer* and imposes upon plaintiff a burden that is out of proportion to the benefit that plaintiff receives from the tax—and, conversely, that the revenues from the tax provide benefits to those who bear none of the burden. The face of the ordinances establishes that such a contention is incorrect. The tax is levied upon every person who patronizes an "amusement" in East Dundee; it creates an indefinitely large class of taxpayers. These taxpayers are treated equally and uniformly; each ticket purchaser pays the same 5% surcharge. Even assuming the ordinance creates a class of one taxpayer, however, we believe it offends neither equal protection nor uniformity. A classification for taxation or regulatory purposes does not violate equal protection merely because the class created has but a single member. (See, *e.g.*, *Mount Prospect State Bank v. Village of Kirkland* (1984), 126 Ill. App. 3d 799 (ordinance treating single mobile home park differently for purposes of garbage collection did not create impermissible classification).) It is not difficult to envision a rational basis for the particular treatment accorded plaintiff or to discern a real and

substantial difference between plaintiff and other entities not taxed. As the evidence at the hearing makes clear, plaintiff is a large business entity in a very small municipality. The Village's government could reasonably conclude that its various revenue needs could not be met without some form of taxation upon the municipality's dominant business. For this court to speculate otherwise would be to usurp the types of policy decisions and balancing of interests that are the primary responsibility of legislative and administrative officials.

Plaintiff's argument that the burden of the tax is disproportionate to the benefit it receives is not availing. Although phrased as an equal protection challenge to the ordinance, this argument is in substance a renewal of a theory of due process that has been discredited. The ordinance here imposes a general revenue tax for the benefit of the Village as a whole. As the United States Supreme Court has ruled, there is no constitutional requirement "that the amount of general revenue taxes collected from a particular activity must be reasonably related to the value of the services provided to the activity." (*Commonwealth Edison Co. v. Montana* (1981), 453 U.S. 609, 622, 69 L. Ed. 2d 884, 897, 101 S. Ct. 2946, 2956.) A general revenue tax is not a fee for specific services, but is a means of distributing the burden of the cost of government, and there is no constitutional imperative that the specific benefits to a given taxpayer achieve a certain proportion to the burden on that taxpayer. (*Commonwealth Edison*, 453 U.S. at 622-23, 69 L. Ed. 2d at 897-98, 101 S. Ct. at 2956, citing *Carmichael v. Southern Coal & Coke Co.* (1937), 301 U.S. 495, 521-23, 81 L. Ed. 1245, 1260-61, 57 S. Ct. 868, 878-79; *Forsberg v. City of Chicago* (1986), 151 Ill. App. 3d 354, 366-67; see also *Crocker v. Finley* (1984), 99 Ill. 2d 444, 452 (distinguishing a "tax" from a "fee" by noting that the former is a "charge having no relation to the services rendered, assessed to provide general revenue rather than compensation"); *Metropolis Theater Co. v. City of Chicago* (1910), 246 Ill. 20, 24, aff'd (1913), 228 U.S. 61, 57 L. Ed. 730, 33 S. Ct. 441 (licensing fee that is imposed as a general revenue measure, unlike one imposed solely as a regulatory measure, need not bear reasonable relation to additional burden imposed by business that is licensed).

Plaintiff relies on a number of opinions from foreign jurisdictions. We are not bound to follow decisions from the lower Federal courts or from sister States. (*Skipper Marine Electronics, Inc. v. United Parcel Service, Inc.* (1991), 210 Ill. App. 3d 231, 239; *People v. Lawrence* (1991), 208 Ill. App. 3d 292, 295.) As the decisional law of this State suggests no constitutional impediment to the tax at issue, we decline to create one from the case law of other jurisdictions.

■ *Having concluded that plaintiff did not raise a fair question as*

to the constitutionality of the amusement tax ordinance, we consider whether plaintiff raised a fair question that the ordinance creates an impermissible special assessment. Again, plaintiff's argument is based on its assertion that *it* is bearing the sole burden of a tax which, it asserts, is in reality a levy for the specific purpose of financing a public improvement (the sewage treatment plant) that benefits the public as a whole. Even were we required to accept plaintiff's characterization of the tax, we would not find that plaintiff has raised a fair question that the tax is invalid for this reason.

Plaintiff relies on section 9—2—45 of the Illinois Municipal Code (65 ILCS 5/9—2—45 (West 1992)), which is part of a series of provisions regulating the imposition of special assessments for local improvements. (See 65 ILCS 5/9—2—42 *et seq.* (West 1992).) Section 9—2—45 requires that no parcel of property shall be assessed a greater amount than it will actually be benefited. Plaintiff argues that it has raised a fair question that the tax requires it to pay an amount out of proportion to the benefit it receives.

Plaintiff's argument founders on the simple fact that the tax is not a "special assessment" at all, but a general revenue tax, and that the part of the Municipal Code on which it relies does not apply at all. Indeed, plaintiff's argument is essentially self-stultifying. Plaintiff stresses that the benefit from the new sewage plant inures to the Village as a whole and not to its property in particular. However, this amounts to a concession that the tax is a general revenue measure and not a special assessment.

It has long been settled in this State that a tax exacts contributions in return for the general welfare, whereas a special assessment is a charge levied against specific property in return for a particular benefit to that property. (*People ex rel. Fisher v. Baltimore & Ohio R.R. Co.* (1945), 390 Ill. 389, 391-92; *DeClercq v. Barber Asphalt Paving Co.* (1897), 167 Ill. 215, 218; *Trustees of the Illinois & Michigan Canal v. City of Chicago* (1851), 12 Ill. 403, 406-07.) This distinction is preserved in the language of the relevant portion of the Municipal Code, which speaks of a "specified improvement" to "the property benefited by the improvement" (65 ILCS 5/9—2—44 (West 1992)). The amusement ordinance cannot fairly be considered a special assessment; as the parties agree, it was never designed to exact a charge in return for a particular benefit to a specific property. As with the constitutional restrictions on the taxing power that we have already discussed, the statutory limitations on special assessments do not require that one who pays a tax for the general revenue receive a corresponding or proportionate benefit from the proceeds of that tax.

We conclude that the manifest weight of the evidence presented to the trial court supports a determination that plaintiff has failed to attack the validity of the tax in such a manner as to demonstrate a likelihood of success on the merits. Therefore, we need not decide whether the balance of hardships provides an additional reason to uphold the denial of a preliminary injunction.

The judgment of the circuit court of Kane County is affirmed.

Affirmed.

DOYLE and PECCARELLI, JJ., concur.