(No. 78806.—

ALLEGRO SERVICES, LTD., *et al.*, Appellants, v. THE METROPOLITAN PIER AND EXPOSITION AUTHORITY, Appellee.

*Opinion filed March 28, 1996.—Rehearing denied June 3, 1996.*

HARRISON, J., took no part.

James McGurk, Santiago Durango and Dennis Bell, of McConnell & Mendelson, and James Geis and Allen C. Zuckerman, all of Chicago, for appellants.

Michele Odorizzi, Hugh R. McCombs, Phillip S. Reed and Erik J. Lillya, of Mayer, Brown & Platt, and Peggy A. Davis, all of Chicago, for appellee.

Jeremy Kahn, of Kahn & Kahn, of Washington, D.C., for *amicus curiae* United Bus Owners of America.

JUSTICE NICKELS delivered the opinion of the court:

This appeal represents our second encounter with

the program of taxes imposed by defendant, the Metropolitan Pier and Exposition Authority (Authority), to finance the renovation and expansion of McCormick Place and related infrastructure improvements. In *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239 (1992), this court upheld a retailers' occupation tax imposed by the Authority on certain food and beverage sales. In the instant case we consider the constitutionality of an airport departure tax imposed by the Authority on providers of ground transportation services from Chicago's O'Hare and Midway Airports. Plaintiffs include several suburban and out-of-state businesses which provide bus, van or limousine transportation from the airports, but which do not serve destinations within the City of Chicago. Plaintiffs brought this action in the circuit court of Cook County on behalf of themselves and all others similarly situated, challenging the constitutionality of the tax under the commerce clause and the equal protection clause of the United States Constitution (U.S. Const., art. I, § 8; amend. XIV) and the uniformity clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, § 2). The trial court entered judgment on the pleadings or summary judgment in the Authority's favor on each of the counts in plaintiffs' class action complaint. We granted plaintiffs leave to appeal directly to this court under Supreme Court Rule 302(b) (134 Ill. 2d R. 302(b)). For the reasons set forth below, we affirm the judgment of the trial court.[1]

---

[1]Plaintiffs have advised us that after oral argument in this case, Congress enacted the ICC Termination Act of 1995 (Pub. Law No. 104—88, 109 Stat. 803 (eff. January 1, 1996)). Plaintiffs contend that the airport departure tax runs afoul of section 14505 of that act, which forbids certain state and local taxes on interstate travel. Section 14505 has no bearing on the constitutional challenges asserted in the trial court and raised on appeal to this

## BACKGROUND

In 1992, the General Assembly enacted Public Act 87—733, eff. July 1, 1992, amending the Metropolitan Pier and Exposition Authority Act (Act) (70 ILCS 210/1 *et seq.* (West 1994)) to provide for a project to renovate and expand McCormick Place (the expansion project). The expansion project includes plans for the renovation of McCormick Place's existing facilities and the construction of a new exhibition hall with a concourse to the existing facilities. It is anticipated that the expanded and improved McCormick Place facilities will lead to a significant increase in tourism to Chicago, thereby boosting certain sectors of the local and regional economy.

To finance the expansion project, the Authority was granted power to issue bonds in an amount not to exceed $937 million. 70 ILCS 210/13.2 (West 1994). In turn, under section 13 of the Act (70 ILCS 210/13 (West 1994)) the Authority is directed to levy a series of local taxes in order to repay the bonds. Section 13(f) provides that "[b]y ordinance the Authority shall *** impose an occupation tax on all persons, other than a governmental agency, engaged in the business of providing ground transportation for hire to passengers in the metropolitan area ***." 70 ILCS 210/13(f) (West 1994). The tax is collected at rates specified in the Act from commercial vehicles departing from Chicago's O'Hare Airport and Midway Airport with passengers for hire. For certain types of transportation service, the tax is imposed at the rate of $1 per passenger. Otherwise, the tax is a flat amount per vehicle which varies depending on the type and capacity of the vehicle. The amounts range from $2 per departure for taxi or livery vehicles to $27 per

court. At this late stage in the proceedings, we decline to consider an entirely new theory of the case that was neither pleaded below nor briefed or argued before this court.

departure for buses or vans with capacities exceeding 24 passengers.

The Authority enacted an ordinance imposing the airport departure tax in accordance with section 13(f), and plaintiffs brought this lawsuit as a class action seeking, *inter alia*, a declaratory judgment that the airport departure tax is invalid. The trial court conditionally certified four classes of plaintiffs who provide airport transportation service exclusively to destinations outside the City of Chicago. Classes A and C consist of operators of taxicabs or limousines based in Illinois (Class A) or outside the State (Class C) that, from time to time, depart from the airports with passengers for hire, but are not licensed by the City of Chicago to operate within its city limits. Class E consists of all operators of buses or vans regulated by the Interstate Commerce Commission that provide scheduled service from the airports with no destinations within the City of Chicago. Class F consists of bus and van operators providing charter or other unscheduled passenger service from the airports to destinations outside the City of Chicago. Vehicle operators with vehicle licenses issued by the City of Chicago who pay the tax are not included in the plaintiff classes.

Plaintiffs' class action complaint, as amended, consists of 13 counts challenging the airport departure tax under a variety of theories. Several counts raise the theory that, as applied to the members of the plaintiff classes, the airport departure tax violates the constitutional guarantees of equal protection and uniformity in nonproperty taxation because only those vehicle operators serving destinations in Chicago stand to benefit economically from increased tourism related to the expansion and renovation of McCormick Place. In other counts, plaintiffs allege that the tax places an impermissible burden on interstate commerce in violation of the

commerce clause of the United States Constitution (U.S. Const., art. I, § 8). The trial court entered judgment on the pleadings in the Authority's favor on those counts brought under the commerce clause and each of the remaining counts except those alleging uniformity and equal protection violations. Thereafter, the parties filed cross-motions for summary judgment on the equal protection and uniformity clause counts. The trial court granted the Authority's motion and denied plaintiffs' motion. Plaintiffs filed a notice of appeal from the trial court's orders, and thereafter filed a motion pursuant to Supreme Rule 302(b) (134 Ill. 2d R. 302(b)) to transfer the appeal to this court. We granted the motion and also granted the United Bus Owners of America leave to file an *amicus curiae* brief in support of plaintiffs.

## ANALYSIS

### I. Uniformity and Equal Protection

Plaintiffs first contend that the trial court erred in denying their summary judgment motion and granting the Authority's motion on those counts alleging that the airport departure tax violates the equal protection clause of the United States Constitution (U.S. Const., amend. XIV) and the uniformity clause of the Illinois Constitution (Ill. Const. 1970, art. IX, § 2). The uniformity clause provides:

> "In any law classifying the subjects or objects of non-property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

The uniformity clause imposes more stringent limitations than the equal protection clause on the legislature's authority to classify the subjects and objects of taxation. *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 247 (1992); *Searle Pharmaceu-*

*ticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 467-68 (1987). "If a tax is constitutional under the uniformity clause, it inherently fulfills the requirements of the equal protection clause." *Geja's Cafe*, 153 Ill. 2d at 247. Accordingly, we need only consider the validity of the airport departure tax under the uniformity clause. See *Geja's Cafe*, 153 Ill. 2d at 247.

## A

To survive scrutiny under the uniformity clause, a nonproperty tax classification must be based on a real and substantial difference between the people taxed and those not taxed, and the classification must bear some reasonable relationship to the object of the legislation or to public policy. *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 468 (1987); see also *Northern Illinois Home Builders Ass'n v. County of Du Page*, 165 Ill. 2d 25, 44-45 (1995); *Geja's Cafe v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 247 (1992); *Federated Distributors, Inc. v. Johnson*, 125 Ill. 2d 1, 15 (1988). The uniformity requirement, as traditionally understood, may be violated by classifications which are either "underinclusive" or "overinclusive." See G. Braden & R. Cohn, The Illinois Constitution: An Annotated and Comparative Analysis 416 (1969) ("where the legislature defines and levies *** [a nonproperty tax] upon a class, *** the class as defined must include only those properly within it and not exclude those reasonably a part of it"). Although the uniformity clause imposes a more stringent standard than the equal protection clause, the scope of a court's inquiry under the uniformity clause remains relatively narrow. *Geja's Cafe*, 153 Ill. 2d at 248. Statutes bear a presumption of constitutionality, and broad latitude is afforded to legislative classifications for taxing purposes. *Geja's Cafe*, 153 Ill. 2d at 248. One challenging a nonproperty tax classification has the burden of showing

that it is arbitrary or unreasonable, and if a state of facts can reasonably be conceived that would sustain the classification, it must be upheld. *Geja's Cafe*, 153 Ill. 2d at 248.

In the case at bar, the common characteristic linking the vehicle operators in the plaintiff classes—and forming the basis of plaintiffs' uniformity clause challenge—is that although they provide ground transportation service departing from the airports, they do not transport airport passengers for hire into the City of Chicago. Some of the class members are prohibited by Chicago's ground transportation licensing ordinance from transporting passengers from the airports to destinations in Chicago. Under the ordinance, a Chicago vehicle license is required to provide transportation service wholly within the city. See Chicago Municipal Code §§ 9—112—020, 9—112—030 (1990).[2] Other class members provide scheduled airport service along routes which do not include destinations in the City of Chicago. Plaintiffs maintain that in terms of the economic impact of the McCormick Place expansion project, there is a real and substantial difference between the vehicle operators in the plaintiff classes and their city-licensed counterparts, because only the operators of city-licensed vehicles enjoy the opportunity to transport passengers from the airports to McCormick Place or nearby downtown hotels. Plaintiffs contend that any positive economic impact from the expansion project for class members is too indirect to support taxing them in the same manner as those operators providing airport transportation to destinations in Chicago, who enjoy a direct benefit by virtue of an increased demand for transportation to McCormick Place and nearby hotels.

_____

[2]Unlicensed vehicles are permitted to transport passengers from points outside Chicago to destinations within the city. Chicago Municipal Code § 9—112—040 (1990).

Plaintiffs rely on *Geja's Cafe*, where, as previously noted, this court upheld the food and beverage tax imposed by the Authority in connection with the McCormick Place expansion project. The tax applied to certain types of food and beverage sales within a geographic subdistrict in Chicago. One of the arguments raised by its opponents was that pursuant to the uniformity requirement, the tax should have been imposed on food and beverage sales throughout Cook County. This court rejected the argument, finding that "[t]he General Assembly could reasonably conclude that the direct beneficiaries [of the expansion project's economic impact] would be those within the taxing subdistrict, and plaintiffs have not produced anything to suggest that narrowing the taxed area in this fashion was unreasonable." *Geja's Cafe*, 153 Ill. 2d at 250-51. Plaintiffs contend that, like the food and beverage tax in *Geja's Cafe*, the Authority's airport departure tax should also be limited to the subclass of vehicle operators who benefit most directly from the expansion project.

In response, the Authority notes that in *Geja's Cafe* this court merely held that it was *permissible* to limit the tax to the geographic subdistrict; the court did not hold or suggest that a more broadly applicable tax would necessarily be unconstitutional. The Authority's observation underscores a basic flaw in plaintiffs' analysis. Plaintiffs' argument rests largely on their understanding that a "real and substantial difference" between the vehicle operators in the plaintiff classes and those who transport passengers from the airports into Chicago would necessarily be fatal to a tax scheme imposing the same taxes on both groups of operators. While *Geja's Cafe* and other decisions under the uniformity clause hold that there must be a real and substantial difference between *the people taxed and those not taxed*, we

are aware of no authority for a converse rule that there may be *no* real and substantial difference *among those taxed*. As this court observed in *Geja's Cafe*, "[t]he uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce *minimum standards of reasonableness and fairness* as between groups of taxpayers." (Emphasis added.) *Geja's Cafe*, 153 Ill. 2d at 252. Accordingly, the "real and substantial difference" standard merely represents the *minimum* level at which the differences among groups are of a sufficient magnitude to justify taxing the groups differently. However, just because the differences between groups reach this minimum level, it does not follow that identical tax treatment would necessarily be unreasonable.

To apply the real and substantial difference test in the manner plaintiffs propose would transform the uniformity requirement from a minimum standard of reasonableness and fairness to a precise formula for drawing tax lines. Under the analysis that plaintiffs advocate, the relative tax treatment of any two groups of potential taxpayers would be preordained by the existence or nonexistence of a real and substantial difference between the groups. Under such an analysis, the taxing body would be deprived of any range of options in the formulation of tax classifications. We reject such a rigid rule. Instead, we adhere to the view that the existence of a real and substantial difference between groups of taxpayers only establishes that differential taxation may be permissible, not that it is constitutionally essential.

Plaintiffs cite *Northwestern University v. City of Evanston*, 221 Ill. App. 3d 893 (1991), in support of their understanding of the real and substantial difference requirement. Plaintiffs' reliance on that decision is misplaced. In *Northwestern*, the appellate court held

that pursuant to the uniformity clause, a local hotel-motel tax could not constitutionally be applied to an educational facility simply because the facility included several floors of sleeping rooms primarily for use by students. As we read *Northwestern*, the *ratio decidendi* was that "[a] taxing body is *** prohibited under the uniformity provisions of the Illinois Constitution from defining statutory terms contrary to their common meaning." *Northwestern*, 221 Ill. App. 3d at 897, citing *Central Television Service, Inc. v. Isaacs*, 27 Ill. 2d 420, 428 (1963). We express no opinion on the quality of this reasoning. Suffice it to say that the decision has no application here.

We agree with plaintiffs that at some point the differences among taxpayers may be so profound that taxing them as a single class would violate the uniformity requirement. In our view, however, this limitation is embraced within the uniformity clause test's second and more general requirement that tax classifications must bear some reasonable relationship to the object of the legislation or to public policy. See *Searle*, 117 Ill. 2d at 468. In other words, the relevant question here is not whether the differences among vehicle operators serving the airports are "real and substantial," but whether the differences are so great that the General Assembly's decision to tax all such operators as a single class bears no reasonable relationship to the object of the tax. We turn to that question below.

## B

The parties agree that in enacting the scheme of taxation to finance the McCormick Place expansion project, the General Assembly sought to impose the tax burden on certain industries that could be expected to realize significant economic benefits from the large number of visitors the project is expected to bring to the Chicago area. The Authority contends that while not all

ground transportation providers who serve the airports will necessarily benefit in precisely the same way or to the same extent, it was still reasonable for the General Assembly to treat all providers as a single class for tax purposes based on anticipated benefits flowing to the class as a whole. The Authority maintains that by focusing exclusively on a limited sector of the market for ground transportation services—the market for transportation from the airports to downtown Chicago—plaintiffs have ignored the broader positive economic impact for the industry in general resulting from the expansion project. Plaintiffs respond that the specific benefits the Authority claims the vehicle operators in the plaintiff classes will enjoy are either nonexistent or "drastically attenuated" and do not support industry-wide taxation.

As a prelude to consideration of these arguments, we digress briefly to address certain procedural matters. First, we note that in *Geja's Cafe*, this court clarified the burdens borne by the parties in litigation involving a uniformity clause challenge. While a classification will be upheld if a state of facts can reasonably be conceived to sustain it, the opponent of a tax is not required to come forward with any and all conceivable explanations for the tax and then prove each one to be unreasonable. *Geja's Cafe*, 153 Ill. 2d at 248. Rather, upon a good-faith uniformity challenge, the taxing body bears the initial burden of producing a justification for the classifications. *Geja's Cafe*, 153 Ill. 2d at 248. Once the taxing body has provided a sufficient justification, the opponent has the burden of persuading the court that the justification is unsupported by the facts. *Geja's Cafe*, 153 Ill. 2d at 248-49.

We also take note of the procedural posture of this case, which is before us on the trial court's ruling in favor of the Authority on the parties' cross-motions for

summary judgment. Summary judgment is appropriate where "the pleadings, depositions, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." 735 ILCS 5/2—1005(c) (West 1994); *Gilbert v. Sycamore Municipal Hospital*, 156 Ill. 2d 511, 517-18 (1993). The purpose of summary judgment is not to try a question of fact, but to determine whether one exists. *Gilbert*, 156 Ill. 2d at 517. Plaintiffs are not required to prove their case at the summary judgment stage. However, to survive a motion for summary judgment, the nonmoving party must present a factual basis which would arguably entitle him to a judgment. *E.g.*, *Gauthier v. Westfall*, 266 Ill. App. 3d 213, 219 (1994). Accordingly, in the present case, to the extent the Authority has produced a legally sufficient justification for its tax classification, plaintiffs would then be required to present a factual basis negating the asserted justification to survive defendant's motion for summary judgment. Conversely, if the Authority has failed to produce a legally sufficient justification for the classification, plaintiffs would be entitled to a judgment as a matter of law.

Applying these principles, we conclude that the Authority has submitted a legally sufficient justification for imposing the airport departure tax on the members of the plaintiff classes who operate taxicab or limousine services from the airports to destinations outside the City of Chicago (Classes A and C). First, the Authority notes that while suburban and out-of-state operators are precluded from making trips into Chicago, Chicago-licensed operators are permitted to operate outside the city. Hence, both categories of operators compete for the business in taking travellers from the airports to suburban and out-of-state destinations. The Authority main-

tains that the generally increased demand for transportation from the airports into the city owing to the McCormick Place expansion project will take many city-licensed operators out of competition for the suburban/out-of-state market, thereby increasing the share of this market served by suburban and out-of-state taxicab and limousine operators. In other words, the increased demand for the city market will allow operators without Chicago licenses to take up the slack in the market for airport transportation to destinations outside the city.

Second, the Authority contends that the demand for downtown hotel rooms during major McCormick Place events is likely to divert other visitors to hotels in the suburbs, thereby increasing the demand for transportation from the airports to those hotels. The Authority notes the findings of a marketing study conducted by the firm of KPMG Peat Marwick in conjunction with the McCormick Place expansion project:

> "A poorly documented but real effect is the ripple effect. When a large event comes to Chicago, demand currently accommodated in an area may be displaced into outlying areas. A convention oriented hotel which has a strong commercial base may displace regular corporate demand to outlying hotels. Meeting events in Chicago regularly have room in the O'Hare, Oakbrook and Rosemont areas. As delegates stay in these hotels, regular business may be displaced to further outlying areas. In this way the outlying areas are getting demand associated with McCormick Place, but it is not from visitors attending McCormick Place events directly."

Plaintiffs contend that their own informal survey shows that, at present, visitors attending McCormick Place events rarely stay in suburban hotels. However, plaintiffs have offered no evidence contradicting the assertion that McCormick Place events displace *other* visitors to outlying areas. Nor have plaintiffs offered any evidence to refute the Authority's theory that suburban and out-of-state taxicab and limousine operators will

benefit from decreased competition in the market they serve. In essence, plaintiffs simply protest that these benefits are too indirect in comparison with the benefits to city-licensed operators. Be that as it may, the benefits identified are nonetheless tangible and would appear to represent reasonable conclusions about the dynamics of related market forces in the local economy. In this regard, we agree with the observation of our appellate court in *Forsberg v. City of Chicago*, 151 Ill. App. 3d 354, 365 (1986), cited by the Authority, that "not all persons burdened by a tax must be benefited in the same way." We cannot say as a matter of law that the inclusion of these vehicle operators bears no reasonable relationship to the object of the tax.

The Authority also points out several potential benefits to the members of the plaintiff classes operating bus or van services (Classes E and F). First, bus and van operators are permitted to transport passengers into Chicago from points outside the city, and do in fact operate both scheduled and charter services with stops in Chicago. The Authority notes deposition testimony that an estimated 30% of the charter business conducted by Sam Van Galder, Inc. (Van Galder)—a Wisconsin-based bus company which is the parent company of plaintiff Alco Bus Corporation (Alco)—consists of trips to museums, baseball games and civic events in Chicago. Thus, the Authority maintains that the expansion project will create new opportunities for bus operators to transport passengers who reside in the suburbs and neighboring states to events at McCormick Place. Moreover, the expansion project includes plans to reroute the northbound lanes of Lake Shore Drive in a manner designed to enhance access to the Field Museum, the Shedd Aquarium and the Adler planetarium, thereby increasing the market for charter services to these already popular attractions. The Authority further notes

that bus companies throughout the area enjoy a substantial volume of business as subcontractors in connection with the market for shuttle service between hotels and conventions held at McCormick Place. Business records of one of the major prime contractors for convention shuttle service show subcontracts to suburban and out-of-state companies for over 1,400 buses during a 17-month period.

Plaintiffs' principal objection to the Authority's reasoning is that the particular examples of charter service that the Authority cites involve separately incorporated affiliates of certain plaintiffs rather than the plaintiffs themselves. For instance, plaintiffs dispute the relevance of the charter business conducted by Van Galder, the parent company of plaintiff Alco. Plaintiffs note that Van Galder's charter business is entirely separate from Alco's airport transportation operation and potential benefits to Van Galder cannot justify imposition of the airport departure tax on Alco. This argument is unpersuasive. The General Assembly cannot be charged with knowledge of the corporate structure of every firm in the ground transportation industry. In formulating tax classifications, the General Assembly is entitled to make reasonable assumptions about the characteristics of the industries subjected to taxation. In this regard, we think it was reasonable for the General Assembly to consider bus companies as integrated enterprises for purposes of appraising the economic impact of McCormick Place and the expansion project.

Plaintiffs also dispute the Authority's contention that suburban and out-of-state bus companies benefit from subcontracting opportunities related to convention shuttle service. Plaintiffs insist that under recent amendments to applicable Chicago ordinances (Chicago Municipal Code §§ 9—112—010, 9—112—360 (1990)), city-licensed charter operators are prohibited from "af-

filiating" with unlicensed operators. The provisions that plaintiffs have identified do not resemble the propositions for which they have been cited. We further note that Chicago has provided by ordinance that temporary permits may be issued to operators of licensed charter/sightseeing vehicles for the operation of additional vehicles as charter/sightseeing vehicles. Chicago Municipal Code § 9—112—120 (1990). Thus, there is no reason to believe subcontracting opportunities have ceased to exist or will in the future. Plaintiffs' argument is without merit.

As with the taxicab and limousine operators, we conclude that the Authority has submitted a legally sufficient justification for imposition of the bus and van operators in the plaintiff classes. Plaintiffs have not introduced evidence showing that the asserted justifications for taxing the members of the four plaintiff classes are factually erroneous. Accordingly, the trial court properly granted the Authority's motion for summary judgment on the counts brought under the uniformity and equal protection clauses.

## II. The Interstate Commerce Clause

We turn now to the question of whether the airport departure tax violates the interstate commerce clause of the United States Constitution. The commerce clause provides that "[t]he Congress shall have Power *** [t]o regulate Commerce *** among the several States ***." U.S. Const., art. I, § 8. While expressed as a grant of power to Congress, it is also well established that the commerce clause "of its own force protects free trade among the States" (*Armco Inc. v. Hardesty*, 467 U.S. 638, 642, 81 L. Ed. 2d 540, 545, 104 S. Ct. 2620, 2622 (1984)) and may serve in certain circumstances as a basis for invalidating state laws that interfere with interstate commerce. This construction "serve[s] the Commerce Clause's purpose of preventing a State from retreating

into economic isolation or jeopardizing the welfare of the Nation as a whole, as it would do if it were free to place burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear." *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.,* 514 U.S. 175, 179-80, 131 L. Ed. 2d 261, 268, 115 S. Ct. 1331, 1335 (1995).

In *Complete Auto Transit, Inc. v. Brady,* 430 U.S. 274, 51 L. Ed. 2d 326, 97 S. Ct. 1076 (1977), the Court announced a four-part test for determining the validity of a state or local tax challenged under the commerce clause. A tax challenged under the commerce clause will be sustained when "the tax [1] is applied to an activity with a substantial nexus with the taxing State, [2] is fairly apportioned, [3] does not discriminate against interstate commerce, and [4] is fairly related to the services provided by the State." *Complete Auto,* 430 U.S. at 279, 51 L. Ed. 2d at 331, 97 S. Ct. at 1079. Plaintiffs do not contend that the airport departure tax discriminates against interstate commerce, but maintain that it violates the other three requirements of the *Complete Auto* test.

Plaintiffs first contend that the airport departure tax does not satisfy the "substantial nexus" requirement. Plaintiffs do not dispute that the taxed activity has a substantial nexus with the State of Illinois. However, plaintiffs insist that because the tax is imposed by the Authority rather than the State, the proper inquiry here is whether the tax applies to activity with a substantial nexus with the Authority. This court's decision in *Geja's Cafe* forecloses plaintiffs' argument. In *Geja's Cafe,* this court concluded that a nexus with *the State* supported the retailers' occupation tax on food and beverage sales imposed by the Authority for the same purposes as the tax at issue here. *Geja's Cafe,* 153 Ill. 2d at 255. Even considering the matter anew in

light of plaintiffs' arguments, we reaffirm the analysis in *Geja's Cafe*.

Plaintiffs rely on *Sea-Land Services, Inc. v. Municipality of San Juan*, 505 F. Supp. 533 (D. P.R. 1980), where, in evaluating a commerce clause challenge to municipal license taxes on companies providing ocean transportation of goods for hire, the court examined the nexus between the taxed activity and the particular municipalities imposing the tax, rather than the Commonwealth of Puerto Rico. *Sea-Land*, 505 F. Supp. at 546. The court reasoned as follows:

> "Local regulatory power may be delegated to municipalities, such as is the case herein. [Citation.] On such account, municipalities have long been recognized certain 'police powers' necessary in the enforcement of local government supervision. [Citation.] Once such powers have been lawfully delegated [citation] defendants may not shield themselves behind the Commonwealth as if they were inexistent juridical entities." *Sea-Land*, 505 F. Supp. at 546 n.57.

We agree with the Authority that the case at bar is distinguishable. The holding in *Sea-Land* appears to be rooted in the fact that the municipalities were the recipients of a delegated taxing power to be exercised at the municipalities' option for the purposes of funding general local governmental operations. Without necessarily endorsing the holding in *Sea-Land*, we would in any event limit that holding to cases where the State's role with respect to a local tax is similarly confined to simply conferring the discretionary taxing power upon the local governmental entity that may impose the tax and that controls the revenues. That is not the case here.

The Authority is a unit of local government with only those powers authorized by law. 70 ILCS 210/3 (West 1994). Unlike the municipalities in *Sea-Land*, the Authority does not possess any police power or otherwise exercise plenary powers of local government, and the

airport departure tax does not represent an independent, discretionary exercise of a delegated taxing power. To the contrary, the tax is imposed pursuant to the express statutory directive that "[b]y ordinance the Authority *shall* \*\*\* impose an occupation tax on all persons \*\*\* engaged in the business of providing ground transportation for hire." (Emphasis added.) 70 ILCS 210/13(f) (West 1994). Moreover, the disposition of funds collected under the tax is specifically governed by statute, and the Authority does not enjoy unbounded discretion in the use of the tax revenues. See 70 ILCS 210/13(g), 13.2 (West 1994). Thus, while the tax has been formally imposed by the Authority, in substance the tax is a manifestation of legislative policy formed at the State level. As such, the appropriate nexus to be examined is that between the taxed activity and the State. As noted above, there is no dispute that this nexus is substantial.

We next consider plaintiffs' contention that the airport departure tax is not fairly related to the services provided by the State. In *Geja's Cafe*, this court observed that this requirement is satisfied "if the person taxed receives 'police and fire protection, the use of public roads and mass transit, and other advantages of civilized society.'" *Geja's Cafe*, 153 Ill. 2d at 256, quoting *Goldberg v. Sweet*, 488 U.S. 252, 267, 102 L. Ed. 2d 607, 621, 109 S. Ct. 582, 592 (1989). Plaintiffs and *amicus* argue that this rationale does not apply here because the Authority does not use the revenues from the airport departure tax to provide any such services. This argument cannot be reconciled with *Geja's Cafe*, since the tax revenues at issue in that case were devoted to the same purposes as the revenues from the airport departure tax.

Nevertheless, plaintiffs and *amicus* argue that the provision of police and fire protection and other general governmental services satisfies the "fair relationship"

requirement *only* when the tax at issue is a general revenue tax. As support for this argument, plaintiffs and *amicus* cite *Commonwealth Edison Co. v. Montana*, 453 U.S. 609, 69 L. Ed. 2d 884, 101 S. Ct. 2946 (1981). The issue in *Commonwealth Edison* was whether taxpayers who paid a Montana severance tax on mineral production were entitled to challenge the tax by showing that the amount collected was not fairly related to the value of services provided by the state to the mining industry. *Commonwealth Edison*, 453 U.S. at 620-21, 69 L. Ed. 2d at 896, 101 S. Ct. at 2955. In concluding that the Montana severance tax could not be defeated on this basis, the Court noted that the tax was a general revenue tax. The Court did so, however, to distinguish the severance tax from " 'user' fees or 'taxes' *** designed and defended as a specific charge imposed by the State for the use of state-owned or state-provided transportation or other facilities." *Commonwealth Edison*, 453 U.S. at 621, 69 L. Ed. 2d at 897, 101 S. Ct. at 2955. The Court observed that "[b]ecause such charges are purportedly assessed to reimburse the State for costs incurred in providing specific quantifiable services, we have required a showing, based on factual evidence in the record, that 'the fees charged do not appear to be manifestly disproportionate to the services rendered.' " *Commonwealth Edison*, 453 U.S. at 622 n.12, 69 L. Ed. 2d at 897 n.12, 101 S. Ct. at 2956 n.12, quoting *Clark v. Paul Gray, Inc.*, 306 U.S. 583, 599, 83 L. Ed. 1001, 1013, 59 S. Ct. 744, 753 (1939). The airport departure tax is a true revenue measure rather than a "user fee" of the sort distinguished from the severance tax in *Commonwealth Edison*. The question remains whether the additional distinction between taxes generating general revenue and those imposed to fund specific governmental functions is germane to the commerce clause analysis.

Outside its use of the term "general revenue tax,"

there is little in the Court's reasoning in *Commonwealth Edison* to suggest that the commerce clause analysis is dependent on how revenues from particular taxes are appropriated. The Court noted that the fair relationship inquiry focuses on " 'whether the State has exerted its power in proper proportion to [the taxpayer's] activities within the State and to [the taxpayer's] consequent enjoyment of the opportunities and protections which the State has afforded.' " *Commonwealth Edison*, 453 U.S. at 625, 69 L. Ed. 2d at 899, 101 S. Ct. at 2957, quoting *General Motors Corp. v. Washington*, 377 U.S. 436, 440-41, 12 L. Ed. 2d 430, 435, 84 S. Ct. 1564, 1568 (1964). In upholding the Montana severance tax, the *Commonwealth Edison* Court stated, "When a tax is assessed in proportion to a taxpayer's activities or presence in a State, the taxpayer is shouldering its fair share of supporting the State's provision of 'police and fire protection, the benefit of a trained work force, and "the advantages of a civilized society." ' [Citations.]" *Commonwealth Edison*, 453 U.S. at 627, 69 L. Ed. 2d at 900, 101 S. Ct. at 2958. This rationale applies with equal force whether tax revenues are collected for general governmental purposes or are earmarked for a specific public purpose as in the present case. The amounts collected under the airport departure tax contribute to the provision of governmental services by alleviating the burden of financing the McCormick Place expansion project with general revenues. Moreover, in connection with our analysis of plaintiffs' challenge under the uniformity clause, we described the economic relationship between the expansion project and the businesses subject to the tax. We find no reason to believe the commerce clause demands a stronger relationship than exists in this case. Accordingly, we hold that the fair relationship requirement is satisfied.

Finally, we consider plaintiffs' argument that the

airport departure tax is not fairly apportioned. The central purpose of the fair apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 184, 131 L. Ed. 2d 261, 271, 115 S. Ct. 1331, 1338 (1995); *Goldberg v. Sweet*, 488 U.S. 252, 260-61, 102 L. Ed. 2d 607, 616, 109 S. Ct. 582, 588 (1989). The requirement that state or local taxes be fairly apportioned "is necessary to avoid a situation in which businesses that operate in more than one state are taxed more heavily, just because they operate in more than one state, than businesses operating in a single state." D. Regan, *The Supreme Court and State Protectionism: Making Sense of the Dormant Commerce Clause*, 84 Mich. L. Rev. 1091, 1186 (1986).

Courts assess the threat of malapportionment by examining whether the tax is "internally consistent" and, if so, whether it is also "externally consistent." *Jefferson Lines*, 514 U.S. at 184, 131 L. Ed. 2d at 271, 115 S. Ct. at 1338. In *Jefferson Lines*, the Court explained the internal consistency requirement as follows:

> "Internal consistency is preserved when the imposition of a tax identical to the one in question by every other State would add no burden to interstate commerce that intrastate commerce would not also bear. This test *** simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate. A failure of internal consistency shows as a matter of law that a State is attempting to take more than its fair share of taxes from the interstate transaction, since allowing such a tax in one State would place interstate commerce at the mercy of those remaining States that might impose an identical tax." *Jefferson Lines*, 514 U.S. at 185, 131 L. Ed. 2d at 271-72, 115 S. Ct. at 1338.

If every state imposed a tax triggered by departures from airports located within the state, each departure

would only result in tax liability to a single state. Accordingly, the possibility that other states might enact taxes identical to the airport departure tax does not cause a failure of internal consistency. *Cf. Jefferson Lines*, 514 U.S. at 185, 131 L. Ed. 2d at 272, 115 S. Ct. at 1338 (Oklahoma tax on gross receipts from in-state sales of tickets for bus travel originating in Oklahoma did not violate the internal consistency requirement because "[i]f every State were to impose *** a tax on ticket sales within the State for travel originating there, no sale would be subject to more than one State's tax").

Plaintiffs' argument is not based on the possibility of multiple taxation by other states, but is instead based on a scenario involving multiple taxation by the State of Illinois and various units of local government in Illinois. Plaintiffs contend that the State of Illinois, the City of Chicago, the County of Cook, and various special districts could all conceivably impose an airport departure tax identical to the tax at issue here. Even assuming *arguendo* that the sort of multiple local taxation plaintiffs describe is possible, this scenario does not demonstrate a failure of internal consistency. It is not merely the possibility of multiple taxation that causes a failure of internal consistency; the internal consistency principle is violated when there is a risk of multiple taxation which places a burden on interstate commerce that is not also borne by intrastate commerce. *Jefferson Lines*, 514 U.S. at 184, 131 L. Ed. 2d at 271, 115 S. Ct. at 1338. The internal consistency doctrine may be viewed as a logical corollary to the proposition that the commerce clause forbids taxes that penalize taxpayers merely because they do business across state lines. W. Hellerstein, *Is "Internal Consistency" Foolish?: Reflections On an Emerging Commerce Clause Restraint On State Taxation*, 87 Mich. L. Rev. 138, 164 (1988).

If the State, the City of Chicago, the County of Cook,

and other units of local government all imposed taxes which, like the Authority's tax, were triggered by departures from O'Hare and Midway, the total tax burden on vehicle operators would obviously multiply. But the increased tax burden would not be a function of crossing state or even local boundaries: all of the taxes owed would become payable upon the occurrence of a single triggering event—the departure from the airport. A vehicle operator would incur the same total tax liability to all the taxing authorities regardless of whether his destination was downtown Chicago, the suburbs or a neighbor state. In other words, under plaintiffs' scenario the taxes paid by all vehicle operators would be higher than they are now, but the tax burden would fall no more heavily on interstate commerce than on intrastate commerce. We note that the multiple taxation doctrine under the commerce clause developed in the context of commerce among states with mutually exclusive territorial jurisdiction. *Cotton Petroleum Corp.*, 490 U.S. 163, 192, 104 L. Ed. 2d 209, 237, 109 S. Ct. 1698, 1716 (1989). Multiple taxation does not offend the commerce clause when the burdensome consequence of the taxation is entirely attributable to the fact that the taxed activity physically occurs at a location where several governmental entities share jurisdiction. *Cf. Cotton Petroleum Corp.*, 490 U.S. at 189, 104 L. Ed. 2d at 235, 109 S. Ct. at 1714. Accordingly, the requirement of "internal consistency" is satisfied.

To be fairly apportioned, a tax must also be "externally consistent." As explained in *Jefferson Lines*:

"External consistency *** looks not to the logical consequences of cloning, but to the economic justification for the State's claim upon the value taxed, to discover whether a State's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing State. [Citations.] Here, the threat of real multiple taxation (though not by literally identical statutes) may

indicate a State's impermissible overreaching." *Jefferson Lines*, 514 U.S. at 185, 131 L. Ed. 2d at 272, 115 S. Ct. at 1338.

We need not address the external consistency requirement in the case at bar. Both plaintiffs and *amicus* assert in a wholly conclusory manner that the airport departure tax is not externally consistent. However, beyond this naked conclusion, neither plaintiffs nor *amicus* has pursued the point with any meaningful analysis of the actual possibility of multiple taxation. The argument presented is inadequate to warrant consideration by this court. 155 Ill. 2d R. 341(e)(7).

Accordingly, the airport departure tax comports with the requirements of the interstate commerce clause, and the trial court properly entered judgment on the pleadings in the Authority's favor on those counts of plaintiffs' complaint challenging the tax under that provision.

## CONCLUSION

For the foregoing reasons, the judgment of the circuit court of Cook County is affirmed.

*Affirmed.*

JUSTICE HARRISON took no part in the consideration or decision of this case.