HAROLD VALSTAD, Indiv. and on Behalf of Valstad Quarry, Inc., *et al.*, Plaintiffs-Appellants, v. RENEE CIPRIANO, Director, The Environmental Protection Agency, *et al.*, Defendants-Appellees.

Fourth District  No. 4—04—0223

Argued February 23, 2005.—Opinion filed May 10, 2005.

906

APPLETON, J., dissenting.

Christine G. Zeman (argued), of Hodge, Dwyer & Zeman, of Springfield, for appellants Harold Valstad, Allendale Gravel Company, Inc., and Anna Quarries, Inc.

Lisa Madigan, Attorney General, of Chicago (Gary S. Feinerman, Solicitor General, and Jerald S. Post (argued), Assistant Attorney General, of counsel), for appellees.

Robert A. Messina, of Illinois Environmental Regulatory Group, of Springfield, *amicus curiae.*

Roger Huebner, of Illinois Municipal League, of Springfield, *amicus curiae.*

JUSTICE STEIGMANN delivered the opinion of the court:

Effective in relevant part July 1, 2003, the General Assembly enacted Public Act 93—32, which is the state budget implementation act for fiscal year 2004 (Pub. Act 93—32, eff. in relevant part on July 1, 2003 (2003 Ill. Legis. Serv. 400, 400) (section 999—1 specified the law took effect on becoming law (June 20, 2003), except the provisions of article 75, which became effective July 1, 2003, except those sections specified as taking effect later (Pub. Act § 999—1, eff. June 20,

2003 (2003 Ill. Legis. Serv. at 567))). In part, Public Act 93—32 added to the Illinois Environmental Protection Act (Act) section 12.5, which requires the Illinois Environmental Protection Agency (Illinois EPA or agency) to collect annual fees from certain holders of National Pollutant Discharge Elimination System (NPDES) permits (Pub. Act 93—32, § 75—52, eff. July 1, 2003 (2003 Ill. Legis. Serv. 400, 482)); 415 ILCS 5/12.5 (West Supp. 2003)). In June 2003, the Illinois EPA issued notices to certain NPDES permit holders, including plaintiffs Harold Valstad, the owner and operator of Valstad Quarry, Inc., and 40 other owners and operators of Illinois quarries, requesting that they pay fees under newly added section 12.5 of the Act. Plaintiffs later paid the fees under protest.

In August 2003, plaintiffs filed a revised complaint against defendants Renee Cipriano, the Illinois EPA Director, the Illinois EPA, and Illinois State Treasurer Judy Barr Topinka, alleging, in pertinent part, that (1) section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)) violates (a) the Illinois Constitution's uniformity clause (Ill. Const. 1970, art. IX, § 2), (b) the Illinois Constitution's equal-protection and due-process clauses (Ill. Const. 1970, art. I, § 2), (c) the Federal Water Pollution Prevention and Control Act (Clean Water Act) (33 U.S.C. §§ 1251 through 1387 (2000)), (d) regulations promulgated under the Clean Water Act, and (e) the supremacy clause of the United States Constitution (U.S. Const., art. VI); and (2) Public Act 93—32, which includes section 12.5 of the Act, violates the single-subject clause of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)).

In September 2003, defendants filed a motion to dismiss plaintiffs' complaint, pursuant to section 2—615 of the Code of Civil Procedure (Code) (735 ILCS 5/2—615 (West 2002)). Following October 2003 and January 2004 hearings, the trial court granted defendants' motion to dismiss.

Plaintiffs appeal, arguing that (1) defendants' motion to dismiss was legally deficient and (2) the trial court erred by (a) dismissing their August 2003 complaint and (b) refusing to allow them an opportunity to amend their complaint. We disagree and affirm.

## I. BACKGROUND

As earlier stated, effective July 1, 2003, the General Assembly enacted Public Act 93—32, the state budget implementation act for fiscal year 2004 (Pub. Act 93—32, eff. in relevant part July 1, 2003 (2003 Ill. Legis. Serv. 400)). Public Act 93—32 amended over 30 different acts, some extensively and others in minor respects. For example, Public Act 93—32 amended (1) the Secretary of State Act (15 ILCS 305/0.01 through 15 (West 2002)), (2) the State Finance Act (30 ILCS

105/1 through 40 (West 2002)), (3) the Retailers' Occupation Tax Act (35 ILCS 120/1 through 14 (West 2002)), (4) the Motor Fuel Tax Law (35 ILCS 505/1 through 21 (West 2002)), (5) the Nursing Home Care Act (210 ILCS 45/1—101 through 3A—101 (West 2002)), (6) the Viatical Settlements Act (215 ILCS 158/1 through 99 (West 2002)), (7) the Illinois Vehicle Code (625 ILCS 5/1—100 through 20—402 (West 2002)), and (8) the Act at issue here (415 ILCS 5/1 through 56.6 (West 2002)). Among other things, Public Act 93—32 added to the Act section 12.5, which requires the Illinois EPA to collect annual fees from certain NPDES permit holders (Pub. Act 93—32, § 75—52, eff. July 1, 2003 (2003 Ill. Laws 400, 489); 415 ILCS 5/12.5 (West Supp. 2003)). The annual fees vary by the source of the pollutant discharge and, for some sources, the "[d]esign [a]verage [f]low rate" of discharge. 415 ILCS 5/12.5(e)(5) (West Supp. 2003). In particular, the Act provides that (1) for NPDES permits for "mines other than mines producing coal [(aggregate mines)], the fee is $5,000" (415 ILCS 5/12.5(e)(4) (West Supp. 2003)) and (2) for NPDES permits for "industrial storm water, the fee is $500" (415 ILCS 5/12.5(e)(9) (West Supp. 2003)). Section 12.5(j) of the Act (415 ILCS 5/12.5(j) (West Supp. 2003)) also provides that (1) all fees collected by the agency should be deposited into the Illinois Clean Water Fund, which was created as a special fund by Public Act 93—32 (Pub. Act 93—32, § 75—52, eff. July 1, 2003 (2003 Ill. Laws 400, 490)); and (2) "[s]ubject to [a]ppropriation, the moneys in the [f]und shall be used by the [a]gency to carry out the [a]gency's clean water activities."

In June 2003, the agency issued notices to certain NPDES permit holders, requesting that they pay fees under newly added section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)). Plaintiffs, who had been issued NPDES permits for aggregate mines, stormwater discharge, or both, paid the fees under section 2a.1 of the State Officers and Employees Money Disposition Act (commonly referred to as the Protest Fund Act) (30 ILCS 230/2a.1 (West 2002)). Those fees ranged from $500 to $53,000 for individual plaintiffs and totaled $461,000.

In August 2003, Valstad Quarry and the Illinois Association of Aggregate Producers filed a petition seeking leave to file a complaint under part three of article XI of the Code (commonly referred to as the Disbursement of Public Monies Act) (735 ILCS 5/11—301 through 11—304 (West 2002)). That initial complaint sought to restrain and enjoin the disbursement of funds collected under section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)). Later in August 2003, defendants filed an objection to the petition, arguing that (1) the Illinois Association of Aggregate Producers lacked standing and (2) the

Disbursement of Public Monies Act was not applicable. Still later in August 2003, the parties entered into an agreed order, under which the trial court (1) entered a temporary order restraining defendants from transferring the fees paid under protest from the State's protest fund, (2) granted Valstad Quarry and the Illinois Association of Aggregate Producers leave to withdraw the original complaint, and (3) granted plaintiffs (Valstad and 40 other owners and operators of Illinois quarries who were members of the Illinois Association of Aggregate Producers) leave to file a revised complaint.

In late August 2003, plaintiffs filed a revised complaint, alleging, in pertinent part, that (1) section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)) violates (a) the Illinois Constitution's uniformity clause (Ill. Const. 1970, art. IX, § 2) (count V), (b) the Illinois Constitution's equal-protection and due-process clauses (Ill. Const. 1970, art. I, § 2) (count II), (c) the Clean Water Act (33 U.S.C. §§ 1251 through 1387 (2000)) (count VII), (d) regulations promulgated under the Clean Water Act (count VI), and (e) the supremacy clause of the United States Constitution (count VIII); and (2) Public Act 93—32, which includes section 12.5 of the Act, violates section 8(d) of article IV of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)) (count IV). (Counts I and III are not at issue in this appeal.)

In September 2003, defendants filed a motion to dismiss plaintiffs' complaint under section 2—615 of the Code (735 ILCS 5/2—615 (West 2002)), arguing, in pertinent part, that counts II, IV, V, VI, VII, and VIII failed to state a cause of action. Defendants also filed a brief in support of their motion. In October 2003, plaintiffs filed a response to defendants' motion.

Following October 2003 and January 2004 hearings on defendants' motion to dismiss, the trial court took the matter under advisement. In February 2004, the court entered a written order granting defendants' motion to dismiss and dissolving the temporary restraining order.

In March 2004, the trial court granted plaintiffs' motion to stay its judgment pending appeal. This appeal followed.

## II. ANALYSIS

### A. The Illinois NPDES Permit Program

In *Citizens for a Better Environment v. Environmental Protection Agency*, 596 F.2d 720, 721-22 (7th Cir. 1979), the Seventh Circuit Court of Appeals discussed the NPDES permit program as follows:

"The history and goals of the [Clean Water Act] and its amendments have been chronicled in numerous judicial opinions. *See, e.g., American Frozen Food Inst. v. Train*, 176 U.S. App. D.C. 105,

111-122, 539 F.2d 107, 113-24 (1976); *California v. EPA*, 511 F.2d 963 (9th Cir. 1975). Congress' ultimate objective was 'to restore and maintain the chemical, physical, and biological integrity of the Nation's waters,' [33 U.S.C. § 1251(a) (1976)], and it established a permit program, the NPDES, to achieve this goal. Under this program, any [point source] pollutant discharge into navigable waters without [a United States] EPA authorization permit is banned, and the EPA was instructed to make the pollution controls inherent in its permits increasingly stringent over time.

Although the administration and enforcement of the permit program initially was vested entirely in the [United States] EPA, Congress intended that much of this authority would devolve to the states. [33 U.S.C. § 1251(b) (Supp. I 1977).] The Clean Water Act stipulates that any time after the promulgation of EPA guidelines establishing the minimum elements of state permit programs, a state may submit a description of a proposed program, along with a statement from the state attorney general that state law provides adequate authority to carry out the program, for evaluation by the Administrator of the [United States] EPA. If the state program satisfies the statutory requirements of section 402(b), 33 U.S.C. § 1342(b), and the guidelines issued under section 304(i), 33 U.S.C. § 1314(i), the Administrator must approve the program. The state would then assume primary responsibility for the issuance of permits and for the administration and enforcement of the NPDES program within its jurisdiction."

A "point source" is defined as "any discernible, confined[,] and discrete conveyance[;] including but not limited to any pipe, ditch, channel, tunnel, conduit, well, discrete fissure, container, rolling stock, concentrated animal feeding operation, or vessel or other floating craft, from which pollutants are or may be discharged." 33 U.S.C. § 1362(14) (2000).

In October 1977, the United States EPA administrator approved Illinois' proposal to administer the NPDES program within Illinois. In *Citizens for a Better Environment*, 596 F.2d at 724, the Seventh Circuit Court of Appeals invalidated the administrator's approval of the Illinois NPDES permit program on the ground that the United States EPA had failed to promulgate regulations providing for public participation in state enforcement actions. In response, the United States EPA promulgated such a regulation (40 C.F.R. § 123.27(d) (2004) (effective April 1, 1983)), and Illinois later agreed to abide by it. In April 1981, the United States EPA approved the revision to Illinois' NPDES program (46 Fed. Reg. 24295—02 (April 30, 1981) (effective April 23, 1983)). See *Prairie Rivers Network v. Illinois Pollution Control Board*, 335 Ill. App. 3d 391, 397-98, 781 N.E.2d 372, 376-77

(2002) (in which this court discussed the history of the Illinois NPDES permit program).

## B. Plaintiffs' Claim That Defendants' Motion To Dismiss Was Legally Deficient

■ Plaintiffs first argue that defendants' motion to dismiss was legally deficient because it "improperly introduce[d] factual assertions in support of their arguments." Specifically, plaintiffs contend that defendants' motion improperly asserted that (1) no similar permit program exists to control non-point-source pollution and (2) of the 40 states authorized by the United States EPA to issue NPDES permits, Illinois was the last one to impose permit fees. We disagree.

The trial court may take judicial notice of law promulgated by other states and the federal government. *People v. Behnke*, 41 Ill. App. 3d 276, 281, 353 N.E.2d 684, 688 (1976); *Atwood Vacuum Machine Co. v. Continental Casualty Co. of Chicago*, 107 Ill. App. 2d 248, 262, 246 N.E.2d 882, 890 (1969). In this case, the complained-of assertions merely summarized two aspects of law related to plaintiffs' claims, not evidentiary facts. Thus, defendants properly included those assertions in their motion to dismiss, and the trial court could have properly taken judicial notice of, and relied upon, those assertions.

## C. Plaintiffs' Claim That the Trial Court Erred by Granting Defendants' Section 2—615 Motion To Dismiss

### 1. *Standard of Review*

■ A section 2—615 motion to dismiss (735 ILCS 5/2—615 (West 2002)) attacks the legal sufficiency of a complaint by alleging defects on the face of the complaint. *Vitro v. Mihelcic*, 209 Ill. 2d 76, 81, 806 N.E.2d 632, 634 (2004); *Armstrong v. Snyder*, 336 Ill. App. 3d 567, 568, 783 N.E.2d 1101, 1103 (2003). When ruling on a section 2—615 motion, a court must accept as true all well-pleaded facts in the complaint and all reasonable inferences that may be drawn therefrom. *Vitro*, 209 Ill. 2d at 81, 806 N.E.2d at 634; *Armstrong*, 336 Ill. App. 3d at 569, 783 N.E.2d at 1103. Our supreme court has determined the critical inquiry regarding a section 2—615 motion to be "whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted." *Vitro*, 209 Ill. 2d at 81, 806 N.E.2d at 634. We review *de novo* an order granting a section 2—615 motion to dismiss. *Vitro*, 209 Ill. 2d at 81, 806 N.E.2d at 634; *Northcutt v. Chapman*, 353 Ill. App. 3d 970, 973, 819 N.E.2d 1180, 1183 (2004).

In addition, we review *de novo* the constitutionality of a statute. "Statutes carry a strong presumption of constitutionality." *Arangold*

*Corp. v. Zehnder*, 204 Ill. 2d 142, 146, 787 N.E.2d 786, 789 (2003) (*Arangold II*). The party challenging a statute has the burden of rebutting that presumption and "clearly establishing" its unconstitutionality. *Russell v. Department of Natural Resources*, 183 Ill. 2d 434, 441, 701 N.E.2d 1056, 1060 (1998). Accordingly, "[t]his court has a duty to uphold the constitutionality of a statute whenever reasonably possible." *Arangold II*, 204 Ill. 2d at 146, 787 N.E.2d at 789-90.

## 2. Plaintiffs' Claim That Section 12.5 of the Act Violates the Uniformity Clause

Plaintiffs argue that the trial court erred by granting defendants' motion to dismiss because section 12.5 of the Act violates the uniformity clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. IX, § 2). Specifically, plaintiffs contend that (1) no real and substantial difference exists between aggregate mines that must have NPDES permits and pay permit fees and (a) Illinois school districts, which must have NPDES permits but are not required to pay permit fees, and (b) non-point-sources of pollutants, which are not required to have NPDES permits or pay permit fees and (2) section 12.5 bears no reasonable relationship to the purpose of Public Act 93—32. We disagree.

■ Article IX, section 2, of the Illinois Constitution provides as follows:

> "In any law classifying the subjects or objects of non[ ]property taxes or fees, the classes shall be reasonable and the subjects and objects within each class shall be taxed uniformly. Exemptions, deductions, credits, refunds[,] and other allowances shall be reasonable." Ill. Const. 1970, art. IX, § 2.

To survive scrutiny under the uniformity clause, a nonproperty tax or fee classification must (1) be based on a real and substantial difference between the people taxed and those not taxed; and (2) bear some reasonable relationship to the object of the legislation or to public policy. *Arangold II*, 204 Ill. 2d at 153, 787 N.E.2d at 793.

The following procedural process is used to determine whether a statute violates the uniformity clause. Upon a good-faith uniformity challenge, the taxing body bears the initial burden of producing a justification for the classification. Then, the plaintiff bears the burden of persuading the court that the justification is not supported by facts or is insufficient as a matter of law. *Arangold II*, 204 Ill. 2d at 153, 787 N.E.2d at 793. The plaintiff who fails to meet its burden of persuasion loses, and the tax classification will be upheld. *Geja's Café v. Metropolitan Pier & Exposition Authority*, 153 Ill. 2d 239, 248-49, 606 N.E.2d 1212, 1216 (1992).

The scope of a court's inquiry under the uniformity clause is

relatively narrow. *Allegro Services, Ltd. v. Metropolitan Pier & Exposition Authority*, 172 Ill. 2d 243, 250, 665 N.E.2d 1246, 1251 (1996). As the supreme court in *Geja's Café* explained:

> "[I]n a uniformity[-]clause challenge[,] the court is not required to have proof of perfect rationality as to each and every taxpayer. The uniformity clause was not designed as a straitjacket for the General Assembly. Rather, the uniformity clause was designed to enforce minimum standards of reasonableness and fairness as between groups of taxpayers." *Geja's Café*, 153 Ill. 2d at 252, 606 N.E.2d at 1218.

See also *Mellon v. Coffelt*, 313 Ill. App. 3d 619, 627, 730 N.E.2d 102, 108 (2000) ("The relevant question is not whether the differences among [the classes] are real and substantial but, rather, whether the differences are so great that the legislature's decision to impose the fee upon all [entities] in *** a single class bears no reasonable relationship to the object of the fee").

In this case, defendants have submitted a legally sufficient justification for imposing fees on aggregate mines holding NPDES permits, which bears a reasonable relationship to the purpose of Public Act 93—32 or public policy.

### a. Private Entities Versus Governmental Entities

■ Plaintiffs contend that no real and substantial difference exists between aggregate mines, which are required to hold NPDES permits and pay fees, and Illinois school districts, which are required to hold NPDES permits but are not required to pay fees.

However, as defendants point out, a real and substantial difference exists between aggregate mines, which are private entities, and school districts, which are governmental entities. The stated purpose of Public Act 93—32 is "to make changes relating to [s]tate [f]inance-[r]evenues that are necessary to implement the [s]tate's [fiscal year] 2004 budget." Pub. Act 93—32, § 1—5, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 401). That broad purpose encompasses the purpose for which the Clean Water Fund was established—to generate funds for use toward eliminating water pollution in the state. In addition to transferring funds from certain line items to others, Public Act 93—32 seeks to increase state revenues by imposing or increasing several fees and taxes. Consistent with the purpose of increasing state revenue (for the Clean Water Fund as well as the general revenue fund), section 12.5(h) of the Act specifically provides that NPDES permit fees "do not apply to the [s]tate or any department or agency of the [s]tate, nor to any school district." 415 ILCS 5/12.5(h) (West Supp. 2003). We agree with defendants that imposing a fee on governmental entities, such as school districts, would not advance the objective of Public Act

93—32 to increase state revenue and, instead, would simply shift funds from one governmental unit to another. Thus, a real and substantial difference exists between governmental and private NPDES permit holders, which is reasonably related to the legislative purpose of Public Act 93—32.

Plaintiffs have failed to rebut defendants' justification. Plaintiffs merely assert that section 12.5(h) of the Act (415 ILCS 5/12.5(h) (West Supp. 2003)) discriminates by imposing a fee on aggregate mines but not on school districts. However, as we discussed above, a real and substantial difference exists between governmental NPDES permit holders, such as school districts, and private NPDES permit holders, such as aggregate mines.

### b. Point Sources of Pollutants Versus Non-Point Sources

■ Plaintiffs next contend that no real and substantial difference exists between aggregate mines, which constitute point sources of pollutants, and entities that constitute non-point-sources of pollutants. Defendants explain that point sources of pollutants are required by the Clean Water Act (33 U.S.C. § 1342 (2000)) to obtain NPDES permits, whereas non-point-sources of pollutants are not required to hold such permits. Accordingly, the Illinois EPA bears expenses related to maintaining the NPDES program and administering NPDES permits to point sources of pollutants. The state bears no such expenses on behalf of non-point-sources of pollutants.

We agree with defendants that the uniformity clause does not mandate that Illinois establish the administrative systems necessary to both (1) identify all non-point-sources of pollutants and (2) impose a fee on those newly identified entities that is comparable to fees imposed on point sources of pollutants. Such onerous administrative tasks would serve to defeat the purpose of Public Act 93—32—that is, to increase state revenue (both for the Clean Water Fund and the general revenue fund)—not enhance it. Thus, a real and substantial difference exists between point sources of pollutants and non-point-sources of pollutants, which is reasonably related to the legislative purpose. See *Searle Pharmaceuticals, Inc. v. Department of Revenue*, 117 Ill. 2d 454, 474-75, 512 N.E.2d 1240, 1248-49 (1987) (in which the supreme court recognized that administrative convenience could constitute a legitimate basis for a legislative tax classification but concluded that under the circumstances of that case, administrative convenience was not fully achieved by the classification of taxes); see also *People v. Keeven*, 68 Ill. App. 3d 91, 100, 385 N.E.2d 804, 810 (1979) (in the context of an equal-protection challenge, the appellate court held that "[a]dministrative convenience furnishes a legitimate basis for legislative classification").

Plaintiffs have failed to rebut defendants' justification for imposing fees on aggregate mines that have been issued NPDES permits. Plaintiffs claim that (1) "no valid justification [exists] for the tax classification, which treats persons differently, based solely upon whether they are required by law to have an NPDES permit" and (2) federal law "does not even require" the imposition of fees on NPDES permit holders. However, as we discussed above, a real and substantial difference exists between point sources of pollutants and non-point-sources, and as defendants pointed out, a valid justification exists for differentiating between those entities that require the use of state administrative processes and resources to issue NPDES permits and maintain the NPDES program and those entities that do not. The mere fact that federal law does not require Illinois to impose fees on NPDES permit holders does not preclude the state from doing so.

c. Section 12.5's Relationship to the Purpose of Public Act 93—32

■ Plaintiffs next contend that section 12.5's imposition of fees is not reasonably related to the legislative purpose of Public Act 93—32 (1) to the extent that the fees exceed the costs of clean water activities and (2) in that the fees constitute a "perpetual" tax. Specifically, plaintiffs assert that the NPDES permit fees are expected to generate $26 million but only $6.4 million was slated to be used for clean water activities in fiscal year 2004.

Initially, as defendants point out, the $6.4 million to be used for clean water activities does not necessarily reflect the state's total expenditures for such activities. For example, that figure does not reflect funds spent by the Pollution Control Board or the office of the Illinois Attorney General, both of which are statutorily mandated to protect Illinois waters from pollution. See 415 ILCS 5/5(c) (West 2002) (the Pollution Control Board shall determine, define, and implement environmental control standards applicable in Illinois); 15 ILCS 215/2 (West 2002) (the Attorney General has the power and authority to prevent water pollution within Illinois by filing a complaint for an injunction or *mandamus*). In addition, nothing indicates that the $6.4 million figure cited by plaintiffs includes the Illinois EPA's overhead costs that are essential to maintain the agency's infrastructure and allow the agency to perform its functions, including clean water activities.

Further, to the extent that the revenue generated by section 12.5's imposition of permit fees may exceed the amount appropriated for clean water activities, we note that the transfer of money accumulated in special funds into a general revenue fund is generally within the legislature's province and authority. *Terra-Nova Investments v.*

*Rosewell*, 235 Ill. App. 3d 330, 340, 601 N.E.2d 1109, 1117 (1992). For example, the Cigarette Tax Act imposes taxes on a specific group of taxpayers and earmarks the proceeds for a special fund from which money can be transferred to the general revenue fund. 35 ILCS 130/2 (West 2002).

As defendants point out, plaintiffs cannot seriously contend that they receive no benefit from state expenditures made out of the general revenue fund for the benefit of all Illinois citizens. Moreover, "perfect rationality is not required as to each taxpayer." *Arangold II*, 204 Ill. 2d at 155, 787 N.E.2d at 793. Thus, the uniformity clause does not require a group that is taxed to be the sole or even primary beneficiary of the tax. See *North Pole Corp. v. Village of East Dundee*, 263 Ill. App. 3d 327, 337, 635 N.E.2d 1060, 1067 (1994) ("A general revenue tax is not a fee for specific services, but is a means of distributing the burden of the cost of government, and there is no constitutional imperative that the specific benefits to a given taxpayer achieve a certain proportion to the burden on that taxpayer"). Instead, the uniformity clause is satisfied even when those taxed benefit only indirectly (*Allegro Services*, 172 Ill. 2d at 258, 665 N.E.2d at 1255) or when others not taxed benefit as well (*Terry v. Metropolitan Pier & Exposition Authority*, 271 Ill. App. 3d 446, 454, 648 N.E.2d 1047, 1053 (1995)).

Finally, as to plaintiffs' claim that section 12.5's imposition of fees on NPDES permit holders constitutes a "perpetual" tax that is not reasonably related to implementing the fiscal year 2004 budget, we note that this claim is based on speculation. In addition, we agree with defendants that nothing in Public Act 93—32 indicates that the changes made to the State's finances and revenues (including the creation of the Clean Water Fund) are temporally limited exclusively to fiscal year 2004. Setting an entirely new schedule of fees and fee rates for each individual fiscal year would be an ineffective way to maintain public funds.

Accordingly, for the aforementioned reasons, we conclude that section 12.5 of the Act (415 ILCS 5/12.5(h) (West Supp. 2003)) does not violate the uniformity clause. We thus further conclude that the trial court did not err by dismissing count V of plaintiffs' revised complaint.

### 3. *Plaintiffs' Claim That Section 12.5 of the Act Violates the Equal-Protection Clause*

■ Plaintiffs also argue that the trial court erred by granting defendants' motion to dismiss because section 12.5 of the Act violates the equal-protection clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2). We disagree.

"The uniformity clause imposes more stringent limitations than

the equal[-]protection clause on the legislature's authority to classify the subjects and objects of taxation." *Allegro Services*, 172 Ill. 2d at 249, 665 N.E.2d at 1251. If a tax is constitutional under the uniformity clause, then it " 'inherently fulfills the requirements of the equal[-] protection clause.' " *Allegro Services*, 172 Ill. 2d at 250, 665 N.E.2d at 1251, quoting *Geja's Café*, 153 Ill. 2d at 247, 606 N.E.2d at 1215. Thus, because we have concluded that section 12.5 of the Act does not violate the uniformity clause, we further conclude that section 12.5 does not violate the equal-protection clause. Accordingly, the trial court did not err by dismissing plaintiffs' equal-protection claim.

### 4. *Plaintiffs' Claim That Section 12.5 of the Act Violates the Due-Process Clause*

Plaintiffs also argue that the trial court erred by granting defendants' motion to dismiss because section 12.5 of the Act violates the substantive due-process clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. I, § 2). We disagree.

Our supreme court has held that "[a]lthough expressed in slightly different language, the standard used to determine whether a statute violates substantive due process is identical to the standard for assessing whether a statute denies equal protection." *People ex rel. Lumpkin v. Cassidy*, 184 Ill. 2d 117, 123-24, 703 N.E.2d 1, 4 (1998). Thus, we agree with defendants that because plaintiffs' equal-protection claim is subsumed by their uniformity-clause claim, plaintiffs' due-process claim is likewise subsumed by the uniformity-clause claim. See *Terry*, 271 Ill. App. 3d at 452, 648 N.E.2d at 1051 (in which the appellate court addressed the plaintiffs' due-process, equal-protection, and uniformity-clause challenges together because they all raised essentially the same issue). We thus conclude that the trial court did not err by dismissing plaintiffs' due-process claim.

### 5. *Plaintiffs' Claim That Public Act 93—32 Violates Section 8(d) of Article IV of the Illinois Constitution*

■ Plaintiffs next argue that the trial court erred by granting defendants' motion to dismiss because Public Act 93—32, which includes section 12.5 of the Act, violates article IV, section 8(d), of the Illinois Constitution (Ill. Const. 1970, art. IV, § 8(d)). Specifically, plaintiffs contend that Public Act 93—32 violates the (1) appropriations clause of article IV, section 8(d), and (2) single-subject clause of article IV, section 8(d).

### a. Appropriations Clause

Plaintiffs first contend that Public Act 93—32 violates the appropriations clause of article IV, section 8(d). Specifically, plaintiffs

complain that Public Act 93—32 improperly appropriates certain amounts from special funds to the general revenue fund and from the general revenue fund to special funds. We disagree.

Article IV, section 8(d), of the Illinois Constitution provides, in pertinent part, that "[a]ppropriation bills shall be limited to the subject of appropriations." Ill. Const. 1970, art. IV, § 8(d). An appropriations bill constitutes legislation that sets apart from public revenue certain amounts of money for specific purposes. *Board of Trustees of Community College District No. 508 v. Burris*, 118 Ill. 2d 465, 477-78, 515 N.E.2d 1244, 1250 (1987); *People v. Norris*, 328 Ill. App. 3d 994, 999, 767 N.E.2d 904, 908 (2002). The appropriations clause prohibits including substantive law in an appropriations bill. That clause does not "invalidate provisions for the distribution of public funds in a bill consisting otherwise of substantive laws." *Norris*, 328 Ill. App. 3d at 999, 767 N.E.2d at 908.

Contrary to plaintiffs' suggestion, the complained-of interfund transfers set forth in Public Act 93—32 do not render Public Act 93—32 an appropriations bill. Instead, it is a bill consisting of substantive law that contains provisions regarding the distribution of public funds. We thus conclude that Public Act 93—32 does not violate the appropriations clause of article IV, section 8(d).

### b. Single-Subject Clause

Plaintiffs also contend that Public Act 93—32 violates the single-subject clause of article IV, section 8(d). Specifically, plaintiffs assert that Public Act 93—32 violates the single-subject rule because some of its provisions do not have a natural and logical connection to the subject of the act. We disagree.

Article IV, section 8(d), of the Illinois Constitution provides, in pertinent part, that "[b]ills, except bills for appropriations and for the codification, revision[,] or rearrangement of laws, shall be confined to one subject." Ill. Const. 1970, art. IV, § 8(d). The single-subject clause is liberally construed in favor of upholding legislation, and the term "subject" is comprehensive in its scope and may be as broad as the legislature chooses. *Arangold Corp. v. Zehnder*, 187 Ill. 2d 341, 352, 718 N.E.2d 191, 198 (1999) (*Arangold I*). The single-subject rule (1) prevents the enactment of legislation that, standing on its own, could not garner the votes necessary for passage and (2) facilitates enactment of bills through a legislative process that is orderly and informed. *People v. Burdunice*, 211 Ill. 2d 264, 267, 811 N.E.2d 678, 681 (2004). "In sum, the single[-]subject rule ensures that the legislature addresses the difficult decisions it faces directly and subject to public scrutiny, rather than passing unpopular measures on the backs of

popular ones." *Johnson v. Edgar*, 176 Ill. 2d 499, 515, 680 N.E.2d 1372, 1379 (1997). The single-subject rule does not "impose an onerous restriction" on the legislature, and the legislature must "go very far" across the line to violate the rule. *Johnson*, 176 Ill. 2d at 515-16, 680 N.E.2d at 1379-80.

We use a two-tiered analysis to determine whether an act violates the single-subject clause. First, we must determine whether the act, on its face, involves a legitimate single subject. Then, we must determine whether the various provisions within the act all relate to the proper subject at issue. *Burdunice*, 211 Ill. 2d at 267, 811 N.E.2d at 681. Thus, if the public act addresses a legitimate single subject, the dispositive question becomes whether the individual provisions of the act have a "natural and logical" connection to that subject. *People v. Boclair*, 202 Ill. 2d 89, 109, 789 N.E.2d 734, 746 (2002).

The number of provisions in an enactment is not determinative of its compliance with the single-subject clause. In addition, the fact that the enactment happens to amend a number of acts already in effect is not determinative. *Arangold I*, 187 Ill. 2d at 352, 718 N.E.2d at 198.

The title of Public Act 93—32 is the "FY2004 Budget Implementation (State Finance-Revenues) Act." Pub. Act 93—32, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 400). Section 1—5 of the Act provides that the purpose of the Act is "to make changes relating to [s]tate [f]inance-[r]evenues that are necessary to implement the [s]tate's [fiscal year] 2004 budget." Pub. Act 93—32, § 1—5, eff. June 20, 2003 (2003 Ill. Legis. Serv. 400, 401). In light of the principles discussed above, we conclude that Public Act 93—32 embraces a single subject— namely, changes related to state finances and revenues that are necessary to implement the state's fiscal year 2004 budget.

We further conclude that the individual provisions of Public Act 93—32 comply with the single-subject clause in that they all concern making changes related to state finance and revenues. Plaintiffs do not dispute that most of the provisions of Public Act 93—32 have a "natural and logical" connection to the subject. However, they contend that the following two provisions do not concern the subject: (1) section 55(c) of the Act, which was amended to require sellers of new and used tires to notify the Illinois EPA of that activity (415 ILCS 5/55(c) (West Supp. 2003)); and (2) section 3—405.1(a) of the Illinois Vehicle Code, which expanded the definition of vanity license plates (625 ILCS 5/3—405.1(a) (West Supp. 2003)). We agree with defendants that those provisions concern making changes related to state finance and revenues. In particular, section 55 of the Act not only requires tire sellers to notify the Illinois EPA of that activity; it also increases the preexisting fee for tire sales, clarifies that the fee applies to the sale of

used tires as well as new tires, and imposes a temporary, additional 50-cent fee on tire sales (415 ILCS 5/55.8(a)(1), (a)(1.5) (West Supp. 2003)). Assuring that tire sellers notify the agency of such sales clearly enhances the collection of fees for those sales.

In addition, section 3—405.1(a) of the Illinois Vehicle Code expands the definition of what types of license plates qualify as vanity plates. 625 ILCS 5/3—405.1(a) (West Supp. 2003). Because the state collects a higher fee for vanity plates ($94 for each set), an increase in the number of licenses that qualify increases the state's revenues.

We thus conclude that these two provisions are not "inconsistent with, or foreign to," the general subject of Public Act 93—32. See *People v. Dunigan*, 165 Ill. 2d 235, 255, 650 N.E.2d 1026, 1035 (1995). Accordingly, we conclude that the trial court did not err by dismissing count IV of plaintiffs' revised complaint.

### 6. *Plaintiffs' Claim That Section 12.5 of the Act Violates the Clean Water Act*

■ Plaintiffs also argue that the trial court erred by granting defendants' motion to dismiss because section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)) violates the Clean Water Act (33 U.S.C. §§ 1251 through 1387 (2000)). Specifically, plaintiffs contend that section 12.5's imposition of NPDES permit fees is preempted by the Clean Water Act. We disagree.

#### a. Supremacy Clause

Pursuant to the supremacy clause of the United States Constitution (U.S. Const., art. VI), Congress has the authority to preempt state law. To determine whether Congress has preempted state law, courts must discern congressional intent. *English v. General Electric Co.*, 496 U.S. 72, 78-79, 110 L. Ed. 2d 65, 74, 110 S. Ct. 2270, 2275 (1990). In doing so, courts must presume that Congress did not intend to displace state law. *Resource Technology Corp. v. Illinois Commerce Comm'n*, 354 Ill. App. 3d 895, 900, 822 N.E.2d 50, 55 (2004).

Under the supremacy clause, a federal enactment can preempt a state statute in three circumstances: (1) when Congress has expressly preempted state action (express preemption), (2) when federal regulation is so comprehensive that no room exists for supplementary state regulation or the field is "so dominant that it displaces state regulation on the same subject" (implied field preemption), and (3) when state action actually conflicts with federal law (conflict preemption). *Resource Technology Corp.*, 354 Ill. App. 3d at 901, 822 N.E.2d at 55.

#### B. Express Preemption

Plaintiffs first contend that the Clean Water Act expressly

preempts the imposition of NPDES permit fees under section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)). Plaintiffs rely on section 301(o) of the Clean Water Act, which provides, in pertinent part, that the administrator of the United States EPA is required to impose fees that reflect "reasonable administrative costs" on those entities seeking modifications of effluent limitations. 33 U.S.C. § 1311(o) (2000). Plaintiffs thus claim that "fees may only be prescribed and collected from those dischargers [of pollutants] who apply for [such] modifications." We are not persuaded.

Simply because one subsection of the Clean Water Act requires the United States EPA administrator to levy a fee under certain circumstances does not, by itself, expressly preclude states from imposing fees upon NPDES permit holders. Plaintiffs have not directed our attention to any provision of the Clean Water Act that expressly preempts Illinois' imposition of permit fees. Instead, as defendants point out, the Clean Water Act recognizes that states can impose fees for NPDES permits, limiting those fees only with respect to federal entities. See 33 U.S.C. § 1323(a) (2000) (which provides, in pertinent part, that federal facilities must comply with all state requirements concerning the control and abatement of water pollution in the same manner and extent as nongovernmental entities, "including the payment of reasonable service charges"). We thus conclude that the Clean Water Act does not expressly preempt the imposition of permit fees under section 12.5 of the Act.

### c. Implied Field Preemption

Plaintiffs next contend that section 12.5's imposition of fees is preempted because the Clean Water Act established comprehensive regulation in the area of water pollution control and abatement. We disagree.

"Implied field preemption occurs where Congress has implemented a comprehensive regulatory scheme in a particular area, thus removing the entire field from the state realm." *Dickey v. Connaught Laboratories, Inc.*, 334 Ill. App. 3d 1048, 1051, 777 N.E.2d 974, 977 (2002).

In this case, we conclude that the Clean Water Act does not occupy the entire field of water pollution control and abatement. Instead, as earlier discussed, Congress intended that much of the authority for administration and enforcement of the NPDES permit program would devolve to the states. See *Citizens for a Better Environment*, 596 F.2d at 722. After the United States EPA has approved a state's NPDES program (as happened in October 1977 with Illinois' program), the state must assume primary responsibility for its program within its jurisdiction.

In so concluding, we note that the case upon which plaintiffs primarily rely is inapposite. In *City of Milwaukee v. Illinois*, 451 U.S. 304, 318-19, 68 L. Ed. 2d 114, 128, 101 S. Ct. 1784, 1793 (1981), the United States Supreme Court concluded that the Clean Water Act preempted federal common law. The Court reasoned that the establishment of such a comprehensive program by Congress "strongly suggests that there is no room for courts to attempt to improve on that program with federal common law." *City of Milwaukee*, 451 U.S. at 319, 68 L. Ed. 2d at 127-28, 101 S. Ct. at 1793. That decision simply did not address whether the Clean Water Act preempts state laws regarding NPDES permit programs.

### d. Conflict Preemption

Plaintiffs also contend that the imposition of NPDES permit fees under section 12.5 of the Act is preempted by the decision of Congress and the United States EPA to "affirmatively decline[ ] to restrict the availability of NPDES permits *** to those with thousands of dollars to spare." We disagree.

In this case, the decision of the United States EPA and Congress not to restrict the availability of NPDES permits based on an entity's ability to pay certain fees does not conflict with the imposition of NPDES permit fees under section 12.5 of the Act. Although " 'a federal decision to forgo regulation in a given area *may* imply an authoritative federal determination that the area is best left unregulated' " (emphases added and omitted) (*Sprietsma v. Mercury Marine*, 537 U.S. 51, 66, 154 L. Ed. 2d 466, 479-80, 123 S. Ct. 518, 528 (2002), quoting *Arkansas Electric Cooperative Corp. v. Arkansas Public Service Comm'n*, 461 U.S. 375, 384, 76 L. Ed. 2d 1, 10, 103 S. Ct. 1905, 1912 (1983)), such is not the case here. As stated above, Congress intended that each state assume primary responsibility for its NPDES program within its jurisdiction. In addition, the Clean Water Act recognizes that states can impose fees for NPDES permits and places limits on those fees only with respect to federal entities. See 33 U.S.C. § 1323(a) (2000).

Accordingly, we conclude that the trial court did not err by dismissing counts VII and VIII of plaintiffs' revised complaint.

### 7. *Plaintiffs' Claim That Section 12.5 of the Act Violates Regulations Promulgated Under the Clean Water Act*

■ Plaintiffs also argue that the trial court erred by granting defendants' motion to dismiss because section 12.5 of the Act (415 ILCS 5/12.5 (West Supp. 2003)) violates regulations promulgated under the Clean Water Act (33 U.S.C. §§ 1251 through 1387 (2000)). Specifically, plaintiffs contend that the state's imposition of NPDES permit

fees constitutes a "revision" of the Illinois NPDES permit program, which requires approval by the United States EPA administrator. We disagree.

Plaintiffs rely on section 123.62 of the Code of Federal Regulations, which provides, in pertinent part, as follows:

"(a) Either [the United States] EPA or the approved [s]tate may initiate program revision. Program revision may be necessary when the controlling [f]ederal or [s]tate statutory or regulatory authority is modified or supplemented. The [s]tate shall keep [the United States] EPA fully informed of any proposed modifications to its basic statutory or regulatory authority, its forms, procedures, or priorities. Grounds for program revision include cases where a [s]tate's existing approved program includes authority to issue NPDES permits for activities on a [f]ederal Indian reservation and an Indian [t]ribe has subsequently been approved for assumption of the NPDES program under 40 C.F.R. part 123 extending to those lands." 40 C.F.R. § 123.62(a) (2004).

Plaintiffs claim that under the plain language of section 123.62(a), the United States EPA administrator was required to approve section 12.5's imposition of NPDES permit fees. We are not persuaded.

Section 123.62 does not define "proposed modifications to [a state's] basic statutory or regulatory authority, its forms, procedures, or priorities." 40 C.F.R. § 123.62 (2004). However, section 123.62(a) does offer guidance by providing an example of a circumstance that would necessitate a "revision" to a state's NPDES program requiring approval by the United States EPA administrator. That example involves a situation in which an entire area of enforcement (a federal Indian reservation) is removed from a state's existing approved authority. See 40 C.F.R. § 123.62(a) (2004). A state's decision to impose NPDES permit fees simply does not rise to the level of a program "revision." We thus conclude that a state's imposition of fees does not constitute a modification related to the state's "basic statutory or regulatory authority, its forms, procedures, or priorities" (40 C.F.R. § 123.62 (2004)) for its NPDES program.

In addition, for a state to have its NPDES program approved by the United States EPA, it must supply a great amount of information, including a description of the organization and structure of the state agency that is responsible for the program and a description of that agency's staff. See 40 C.F.R. § 123.22(b) (2004). However, a state is required to submit only limited information regarding the financing of its NPDES program. In that regard, sections 123.22(b)(2) and (b)(3) provide that a state shall submit (1) "[a]n itemization of the estimated costs of establishing and administering the program for the first two

years after approval" and (2) "[a]n itemization of the sources and amounts of funding \*\*\* available to the [s]tate [d]irector for the first two years after approval to meet the costs." 40 C.F.R. § 123.22(b)(2), (b)(3) (2004). No requirement exists that a state applicant supply its NPDES permit-fee structure when it seeks initial approval of its NPDES program. If a state is not required to submit such information when it first seeks approval of its program, it stands to reason that it would not later be required to submit information regarding its permit fees.

Further, in the context of approving the Texas NPDES program, the United States EPA indicated that it was not appropriate for the EPA, as a federal agency, to become involved in the state's decision to increase fees. 63 Fed. Reg. 51164, 51178 (September 24, 1998). The United States EPA stated, in pertinent part, as follows:

"Some [public] comments indicate encouragement regarding the [s]tate [l]egislature's support for increased funding for the [program] through an increase in the annual cap related to wastewater fees. Others commented that any increases in fees should be related to services actually rendered to that permittee.

[The United States EPA] Response: [the United States] EPA can only require that the [Texas] program be adequately funded. Choices as to the sources of the fund, e.g., general revenue taxes, permit fees, etc., are at the discretion of the Texas [l]egislature. It would neither be appropriate, nor constitutional, for the federal government to dictate exactly how a [s]tate government must fund its [s]tate programs." 63 Fed. Reg. at 51178.

Accordingly, we conclude that the trial court did not err by dismissing count VI of plaintiffs' revised complaint.

### D. Plaintiffs' Claim That the Trial Court Erred by Refusing To Allow Them To Amend Their Complaint

Last, plaintiffs argue that the trial court erred by refusing to allow them to amend their complaint. We disagree.

We will not reverse a trial court's decision to deny a plaintiff an opportunity to file an amended complaint absent an abuse of discretion. *Bates v. Richland Sales Corp.*, 346 Ill. App. 3d 223, 230, 803 N.E.2d 977, 983 (2004). Plaintiffs claim that in their October 2003 response to defendants' motion to dismiss, they requested leave to amend their complaint if the trial court deemed it appropriate, "based upon a curable defect." Based on our earlier analysis and rejection of plaintiffs' argument that the court erred by granting defendants' motion to dismiss, we conclude that no "curable defect" existed. Accordingly, we further conclude that the trial court did not abuse its discretion by denying plaintiffs an opportunity to amend their complaint.

See *Welch v. Illinois Supreme Court*, 322 Ill. App. 3d 345, 360, 751 N.E.2d 1187, 1200 (2001) ("Where it is apparent that even after amendment no cause of action can be stated, leave to amend should be denied").

In so concluding, we note that despite plaintiffs' claim that their October 2003 response included a request to amend their complaint, our review of that response shows that plaintiffs requested only that the trial court deny defendants' motion to dismiss and "grant such other relief as [that] [c]ourt deems equitable and just." Nor does the record include a proposed amended complaint.

## III. CONCLUSION

For the reasons stated, we affirm the trial court's judgment.

Affirmed.

TURNER, J., concurs.

JUSTICE APPLETON, dissenting:

I respectfully dissent from the majority's decision. For no apparent reason, the classification in section 12.5(e) of the Act excludes agricultural point sources. See 415 ILCS 5/12.5(e) (West Supp. 2003).

A classification can violate the uniformity clause by being either overinclusive or underinclusive. *Allegro Services*, 172 Ill. 2d at 250, 665 N.E.2d at 1251. If the legislature excludes persons from the class that must pay a "non[-]property tax[ ] or fee[ ]" (Ill. Const. 1970, art. IX, § 2), the legislature must have a legitimate reason for doing so. The persons excluded must be different, in some material way, from the persons included. *Searle Pharmaceuticals, Inc.*, 117 Ill. 2d at 478, 512 N.E.2d at 1250.

In their brief, plaintiffs repeat the observation they made in their complaint: that not all holders of NPDES permits have to pay discharge fees. The *amici* cite animal feeding operations as an example, and in their reply brief, plaintiffs repeat that example. Animal feeding operations are point sources, and if they meet the criteria in the agency's regulations, they need an NPDES permit. 35 Ill. Adm. Code §§ 502.101 to 502.106 (Conway Greene CD-ROM June 2003). The same holds true for livestock waste-handling facilities (35 Ill. Adm. Code § 502.205 (Conway Greene CD-ROM June 2003)), livestock management facilities (35 Ill. Adm. Code § 502.205 (Conway Greene CD-ROM June 2003)), fish farms (35 Ill. Adm. Code § 503.101 (Conway Greene CD-ROM June 2003)), and irrigation activities (35 Ill. Adm. Code § 503.102 (Conway Greene CD-ROM June 2003)). Although

the legislature purports, in section 12.5(a), to create a class consisting of *"all* discharges that require an NPDES permit" (emphasis added) (415 ILCS 5/12.5(a)(i) (West Supp. 2003)), the actual fee schedule in section 12.5(e), which lists the types of point sources and the amounts each must pay, makes no mention of agricultural point sources. Animal feeding operations, for example, are not on the list in section 12.5(e). Therefore, unlike mines, storm sewer systems, and other assorted point sources, they need not pay for a discharge permit. See 415 ILCS 5/12.5(e) (West Supp. 2003).

I can find no legitimate reason for excluding agricultural point sources from the NPDES permit fee. According to section 11(a)(1) of the Act, all water pollution exacts a societal cost. It threatens people and wildlife, depresses property values, reduces opportunities for recreation, and offends the senses. 415 ILCS 5/11(a)(1) (West 2002). Ultimately, all of these effects of water pollution harm the public fisc by making the state a less desirable place for tourism or habitation.

A pollution tax (which is what the discharge "fee" predominantly is) "forces emitters to pay for (and thereby internalize) the pollution they create." J. Barrett, *The Global Environment and Free Trade: A Vexing Problem and a Taxing Solution*, 76 Ind. L.J. 829, 843 (2001). Also, "market-based instruments," such as pollution taxes, "provide dynamic incentives for the adoption and diffusion of cheaper and better [pollution-]control technologies." N. Keobane & R. Revesy, *The Choice of Regulatory Instruments in Environmental Policy*, 22 Harv. Envtl. L. Rev. 313, 314 (1998). If municipal sewage systems must pay for a permit to discharge human waste into the waters of our state (415 ILCS 5/12.5(e)(2) (West Supp. 2003)), even treated human waste (415 ILCS 5/12.5(e)(1) (West Supp. 2003)), animal feeding operations should have to pay to discharge animal waste, which is surely just as harmful to the environment and just as offensive to the senses. If sewage plants must internalize their pollution, so should animal feeding operations.

Animal feeding operations are, of course, different from municipal sewage systems in many ways, but these differences are all "fortuitous" (see *Grasse v. Dealer's Transport Co.*, 412 Ill. 179, 196, 106 N.E.2d 124, 133 (1952)). One cannot defeat the uniformity clause in this case simply by observing that, unlike the point sources listed in section 12.5(e), animal feeding operations are agricultural. All owners of point sources that must pay for NPDES permits could make a comparable observation regarding themselves. For example, factories could say they are industrial. See 415 ILCS 5/12.5(e)(5) (West Supp. 2003). Publicly owned sewage treatment plants could say they are governmental. See 415 ILCS 5/12.5(e)(1), (e)(2) (West Supp. 2003).

Mines could say they are mines. See 415 ILCS 5/12.5(e)(3), (e)(4) (West Supp. 2003). If the class, by definition, consists of a diverse assortment of point sources united only by their status as NPDES permittees, one cannot logically exclude animal feeding operations because of the nature of its enterprise.

While this issue is not fully developed by the parties, I am also troubled by the exclusion of non-point-source discharges from the application of a tax-generating fee, which is designed by the state to help support the overall operation of the Illinois EPA. However, because certain point sources are excluded from the obligation to pay the tax, I would find, based upon that alone, the fee at issue fails to be consistent with the constitutional prescription of uniformity.